# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

CARPENTER CONTRACTORS OF
AMERICA, INC., d/b/a R & D THIEL, et al.

Debtors.

_____

Case No. 10-B-42604-RBR
(Jointly Administered)

Chapter 11

## DEBTORS' MOTION FOR AN ORDER (1) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING; (2) AUTHORIZING USE OF CASH COLLATERAL; (3) PROVIDING ADEQUATE PROTECTION; AND (4) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

Carpenter Contractors of America, Inc. d/b/a R & D Thiel ("Carpenter Contractors") and CCA Midwest, Inc. ("CCA" and, together with Carpenter Contractors, the "Debtors") submit this motion ("Motion") requesting entry of an Order pursuant to sections 105, 361, 362, 363, 364, and 507(b) of the Bankruptcy Code (Title 11, U.S.C.), Federal Rule of Bankruptcy Procedure 4001, Local Rule of Bankruptcy Procedure 4001-2, and the Court's Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing (the "Guidelines"), authorizing them to (i) obtain postpetition financing pursuant to section 364 of the Bankruptcy Code from First American Bank subject to the terms and conditions set forth herein, (ii) use cash collateral, (iii) grant security interests, mortgages and other liens and super-priority claims to First American Bank (including a priority lien pursuant to section 364(c)(1) of the Bankruptcy Code, and claims, liens and security interests pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code), and (iv) grant security interests, mortgages and other liens and super-priority claims in order to provide adequate protection to First American Bank. In support of their Motion, the Debtors state as follows:

## I.    <u>Jurisdiction</u>

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D) and (M).  Venue is proper pursuant to 28 U.S.C. §§ 1408.

## II.    <u>Background</u>

### A.    **The Debtors' Business**

2.    Carpenter Contractors is an Illinois corporation that provides carpentry services to builders of new homes primarily in Illinois and Florida.  In addition, Carpenter Contractors manufactures building components and distributes construction materials in Illinois, Florida, and North Carolina. Carpenter Contractors receives substantially all of its income from subcontracting carpentry services and sales of building components and construction materials to homebuilders and developers.  Carpenter Contractors' corporate headquarters are located at 941 SW 12th Avenue, Pompano Beach, Florida 33880.

3.    CCA, also an Illinois corporation, provides carpentry services to builders of new homes in Illinois.  CAA is a wholly-owned subsidiary of Carpenter Contractors.  CCA receives substantially all of its income from providing carpentry services with non-union workers and by supplying building components and construction materials, primarily to very large, publicly-traded homebuilders.  CCA's corporate headquarters are located at 243 Newburgh Road, Belvidere, Illinois 61008.

### B.    **The Prepetition Loans and Security Interests**

4.    The Debtors' prepetition lender was First American Bank (the "<u>Bank</u>," and in its capacity as prepetition lender, the "<u>Prepetition Lender</u>," and in its capacity as postpetition lender, the "<u>Postpetition Lender</u>," and in each capacity, the "<u>Lender</u>").

5.      On or about July 11, 2008, the Debtors and the Prepetition Lender entered into a Senior Secured Credit Agreement (as amended, modified or supplemented the "Prepetition Loan Agreement").  In connection with and subsequent to the Prepetition Loan Agreement, the Debtors and Prepetition Lender entered into certain related agreements and documents (collectively, with the Prepetition Loan Agreement, the "Prepetition Financing Documents").

6.      Pursuant to the Prepetition Financing Documents, the Prepetition Lender extended to the Debtors credit in the total amount of $21,692.859.00, in the form of a revolving note and four letters of credit (of which two remain).

7.      As of October 25, 2010 (the "Petition Date"), the Debtors' outstanding indebtedness to the Prepetition Lender totaled $10,364,881.75, which amount includes (i) $7,328,821.40 on account of the revolving note (inclusive of interest and fees), (ii) $932,893.90 on account of a letter of credit letter issued as additional credit support for the Debtors' obligations under Industrial Revenue Bonds related to the Debtors' facilities in Fayetteville, North Carolina, and (iii) $2,103,166.45 on account of a letter of credit letter issued as additional credit support for the Debtors' obligations under Industrial Revenue Bonds related to the Debtors' facilities in Belvidere, Illinois.  Since the Petition Date and with Court approval, the Debtors have paid prepetition interest owed to the Prepetition Lender and have also made a semi-annual payment due under one of the letters of credit.  As a result, as of February 15, 2011, the Debtors' outstanding indebtedness to the Prepetition Lender was $10,227,574.53.

8.      Pursuant to the Prepetition Financing Documents, the Bank as Prepetition Lender holds a first-priority security interest in substantially all of the Debtors' assets, including but not limited to (i) equipment, (ii) fixtures, (iii) inventory, (iv) documents, (v) instruments, (vi) accounts, (vii) general intangibles, (viii) deposit accounts, (ix) cash, (x) real property

3

commonly described as 2340 Newburg Road, Belvidere, Illinois, (xi) real property commonly described as 190 Gillis Hill Road, Hoke County, Fayetteville, North Carolina, and (xii) the proceeds, products, rents and profits of all of the foregoing (all of the foregoing collateral described above, together with all of the proceeds, products, rents and profits thereof shall be referred to herein collectively as the "Prepetition Collateral," and the Bank's liens and security interests therein as Prepetition Lender shall be referred to herein as the "Lender's Prepetition Liens").[1]

C.     **The Debtors' Postpetition Use of the Bank's Cash Collateral**

9.     On the Petition Date, Carpenter Contractors filed its *Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral* (DE #4).  CCA filed its own *Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral* on October 28, 2010 (DE #28).  Collectively, the Debtors' motions are referred to herein as the "Cash Collateral Motions."

10.     In the Cash Collateral Motions, the Debtors requested authorization to use the Bank's cash collateral to fund their ongoing operations.  To date, the Bank has consented to the Debtors' interim use of cash collateral.

11.     The Court has entered three interim orders authorizing the Debtors' use of cash collateral.  (*See* DE #194,[2] DE #229, and DE #258.)  The interim orders, among other things, (a) required the Debtors to submit monthly budgets and to exceed those budgets by no more than 10%, (b) granted the Bank replacement liens on the Debtors' postpetition property

---

[1] The Bank does not assert a prime security interest in tangible personal property subject to a properly perfected purchase money security interest or where the Debtors are lessees under a bona fide true lease.  The Bank's security interests and liens are also subordinate to *ad valorem* taxes which constitute a prime lien under applicable non-bankruptcy law.

[2] The first interim order, originally entered on October 28, 2010 (DE #30), was amended by order dated December 9, 2010 (DE #194).

consistent with the terms of the Prepetition Financing Documents, and (c) granted the Bank additional adequate protection by requiring the Debtor to (i) pay all *ad valorem* taxes when due, (ii) maintain all casualty insurance and name the Bank as a loss payee on all policies related to property over which the Bank asserts a security interest, (iii) maintain all bank accounts with the Bank, (iv) supply the Bank with all reports required by the Prepetition Financing Documents, (v) pay all postpetition interest accruing on account of the Prepetition Financing Documents, and (vi) make a payment due on November 1, 2010, on account of one of the letters of credit.  The second and third interim orders limited the amounts the Debtors could expend on their luxury jet, and the third interim order required the Debtors to pay the Bank's pre- and postpetition interest and fees.

### III.    The Proposed Postpetition Financing Facility and Use of Cash Collateral

#### A.    Description of the DIP Financing Facility

12.    To continue present business operations, the Debtors require immediate access to postpetition financing from the Postpetition Lender, use of the Prepetition Lender's cash collateral, more efficient use of its working capital, and a commitment to make exit financing available.

13.    The Debtors, together with the Lender, have reached an accommodation whereby they jointly request entry of an Order in the form of Exhibit A hereto (the "DIP Financing Order") authorizing the Debtors, pursuant to Sections 363 and 364 of the Bankruptcy Code and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure to obtain postpetition financing (the "DIP Facility") by borrowing: (I) $2,500,000 in the form of a term note, which will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%), and (II)  the lesser of (a) the "Loan Limit" or (b) the "Advance Rate." The "Loan Limit" is $5,120,000.  The "Advance Rate" is the sum of 80% of all eligible accounts

receivable and 35% of all eligible inventory (provided that the cap on inventory advances is $2,000,000).

14.     Additionally, the DIP Financing Order would authorize the Debtors: (a) to use the Bank's prepetition and postpetition cash collateral (the "Cash Collateral"), within the meaning of Bankruptcy Code §363(a), and to provide adequate protection therefor, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(c), to the Bank as Lender; (b) to grant the Bank as Postpetition Lender, pursuant to Bankruptcy Code § 364(c) and 364(d), security interests in all of the Debtors' currently owned and after acquired property (other than the Excluded Collateral such as the Debtors' real property located at 3900 Avenue G, N.W., Winter Haven, FL 33880) to secure the Debtors' obligations under the DIP Facility; and (c) to grant the Bank as Postpetition Lender super-priority claims with respect to the Debtors' obligations under the DIP Facility over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b).

15.     Without the proposed postpetition financing facility sought hereunder, the Debtors will not have the liquidity required to maintain their operations in the ordinary course for the benefit of their customers, vendors and employees, fund the costs of the Chapter 11 Cases, and ensure a smooth and expedient path to confirmation of a plan of reorganization. The success of the Debtors' reorganization, therefore, depends upon obtaining the relief requested in this Motion.

16.     The Lender and the Debtors have negotiated at arms-length and in "good faith" (within the meaning of section 364(e) of the Bankruptcy Code) the financing arrangements pursuant to which (a) the Bank as Postpetition Lender will advance amounts necessary to fund the expenses set forth in the Budget attached hereto as Exhibit B, and (b) the Lender as

Prepetition Lender will authorize the use of Cash Collateral.  All parties have been represented by counsel in these negotiations and in the preparation of the DIP Financing Order.  Consistent with the terms of this Court's interim cash collateral orders, the DIP Financing Order provides that, for any four-week period, the Debtors may not expend Cash Collateral for any payments or expenses related to the airplane leased by the Debtors in excess of $10,000 over and above revenues generated by the charter during such four-week period.

      17.    The Lender as Postpetition Lender is willing to lend money and extend credit to the Debtors, and the Lender as Prepetition Lender is willing to allow the use of Cash Collateral to the Debtors, in each case, only on the terms and conditions set forth in the DIP Financing Order.  The terms and conditions of the DIP Facility and use of Cash Collateral are fair and reasonable and are believed by the Debtors to be the best terms available under the circumstances.

### B.    Use of Cash Collateral

      18.    Pursuant to sections 363(a) and 552(b) of the Bankruptcy Code, certain cash and cash equivalents held by the Debtors as of the commencement of these Chapter 11 Cases and the proceeds, products, offspring, rents, or profits of the Lender's collateral as Prepetition Lender received by the Debtors after the commencement of the cases, may constitute Cash Collateral in which the Prepetition Lender has an interest.

      19.    The Debtors propose to use the cash generated in their business, including the cash in their possession on the Petition Date, and the cash generated by the collection of their accounts receivable and business operations in order to fund continuing operating expenses during the Chapter 11 Cases.  To the extent that such cash constitutes Cash Collateral encumbered by the security interests of the Prepetition Lender, the parties have agreed to the use of Cash Collateral upon the terms and conditions of the DIP Financing Order.

20.    Among other things, the DIP Financing Order contemplates that in the agreements governing the DIP Facility, the Debtors will agree to the use of a "lockbox" and enter into an agreement substantially in the form of the Lockbox Agreement attached hereto as Exhibit C. The Debtors shall direct all of their customers, clientele, and account debtors to make all payments directly to a post office box (a "Lockbox") designated by, and under the exclusive control of, the Bank. Each of the Debtors shall establish a Lockbox and a deposit account (each, a "Lockbox Account") in its name with the Bank into which all payments received in the applicable Lockbox shall be deposited; provided, however, that the Debtors may accept checks from customers in return for lien releases. To the extent that the Debtors accept checks from customers in return for lien releases, the Debtors shall deposit such checks with the Bank electronically via remote deposit capture immediately upon receipt of such checks. Each Debtor shall also deposit all payments it receives into the appropriate Lockbox Account. All funds deposited into any Lockbox or any Lockbox Account will be swept on a daily basis into a separate deposit account maintained by the Debtors with the Bank and under the exclusive control of the Bank (the "Collection Account"). On each business day, the Bank shall apply funds received into the Collection Account (after a clearance period of three business days applied to those funds) according to the priority of payments set forth in the DIP Financing Order.

21.    In addition, the Debtors shall maintain all of their bank accounts, whether deposit accounts or otherwise, with the Bank. Furthermore, on each day that the Debtors require funds and wish to draw down on their line of credit, the Debtors shall submit a draw request to the Bank to obtain such funds.

22.     These terms are necessary to ensure that the Postpetition Lender receives repayments for Cash Collateral advanced to the Debtors and these terms are consistent with standard commercial practices.

## IV.     Request For Approval Of Postpetition Financing and Use of Cash Collateral

23.     As described above, it is essential to the success of these cases that the Debtors immediately obtain access to postpetition financing and be allowed to use the Prepetition Lender's Cash Collateral.  Absent access to the Cash Collateral and the financing that will be available to the Debtors under the proposed DIP Facility on a final basis, the Debtors will be unable to maximize the value of their estates for the benefit of their creditors.  The Debtors' ability to reorganize successfully in these cases and to reduce losses to creditors depends heavily upon the relief requested.

24.     The Debtors request the entry of the Order approving the proposed DIP Financing Order in the form attached as Exhibit A.

## V.     Disclosure of Relevant Terms

25.     The following disclosure of certain terms contained in proposed DIP Financing Order is made pursuant to Federal Rule of Bankruptcy Procedure 4001, Local Rule 4001-2, and the Guidelines:

    a.     **Summary of Essential Terms.**  The Order will authorize the Debtors to borrow (I) $2,500,000 in the form of a term note, which will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%), and (II) the lesser of (a) the "Loan Limit" or (b) the "Advance Rate."   The "Loan Limit" is $5,120,000.  The "Advance Rate" is the sum of 80% of all eligible accounts receivable and 35% of all eligible inventory (provided that the cap on inventory advances is $2,000,000).

       The Order will also authorize the Debtors: (i) to use the Lender's prepetition and postpetition cash collateral, within the meaning of Bankruptcy Code § 363(a), and to provide adequate protection therefor,

pursuant to Bankruptcy Code §§ 361, 363(e) and 364(c), to the Lender; (ii) to grant the Lender as Postpetition Lender, pursuant to Bankruptcy Code § 364(c) and 364(d), security interests in all of the Debtors' currently owned and after acquired property (other than the Excluded Collateral such as the Debtors' real property located at 3900 Avenue G, N.W., Winter Haven, FL 33880) to secure the Debtors' obligations under the DIP Facility; and (iii) to grant the Lender as Postpetition Lender super-priority claims with respect to the Debtors' obligations under the DIP Facility over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b).

b.    **Grant of Priority or Lien on Property of the Estate Under § 364(c) or (d).**  Yes.  See paragraphs 8 and 9 of the Order.

c.    **Cross-collateralization Other than as Adequate Protection.**  No.  The Lender is not obtaining a lien on the Debtors' unencumbered assets.  As of the Petition Date, the Lender held a first-priority security interest on substantially all of the Debtors' assets.  The Lender's prepetition security interests will continue to secure the Prepetition Indebtedness as well as amounts advanced under the proposed DIP Financing Order.

d.    **Waiver or Modification of Any Entity's Authority or Right to File a Plan, Seek an Extension of the Debtors' Exclusivity Period, or Request Authority to Obtain Credit under § 364.**  Yes.  Paragraph 22 of the Order prohibits the Debtors from further seeking authority to obtain credit under section 364.

e.    **Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order.**  No.

f.    **Waiver or Modification of the Applicability of Non-bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of a Lien.**  Yes.  Paragraph 25 of the Order provides that the Lender's Postpetition Liens will be deemed perfected upon entry of the Order and without the requirement of any further filings or acts.

g.    **Indemnification of any Entity.**  No.

h.    **Granting of a lien on any claim or Cause of Action Arising under § 544, 545, 547, 548, 549, 553(b), 727(a), or 724.**  No.

i.    **Waiver of Rights Under § 506(c).**  Yes.  See paragraph 2 of the Order.

j.    **Findings Regarding Validity, Perfection, or Amount of Secured Creditor's Lien or Debt and Waiver of Claims Against Secured Creditor.**  Yes.  Paragraphs H, I, 2, and 19 of the Order contemplate the

Debtors' stipulation regarding the validity, perfection, priority, and amount of the Lender's prepetition liens and the Debtors' prepetition indebtedness in the amount of $10,364,881.75. Pursuant to paragraph 19 of the Order, all claims challenging the validity, extent, priority, perfection, and enforceability of the Lender's prepetition liens, mortgages, and security interests in the Debtors' assets shall be barred, including those claims of any subsequently appointed trustee.

k.  **Provisions or Findings of Facts that bind a Subsequently Appointed Trustee.** Yes. See Paragraph 19 of the Order and discussion in bullet point (j) above.

l.  **Provisions Granting liens on the Debtors' Property that is Unencumbered by Consensual Liens.** No.

m.  **Roll-Up of Prepetition Debt or Use of Postpetition Loans to Pay Prepetition Debt (Other than under § 552(b)).** Yes. Paragraph 4 of the Order provides that as the Debtors' business continues to operate, the prepetition debt will be paid off and replaced with postpetition debt.

n.  **Different Treatment of Professionals and Limit on Committee Use of Carve-Out.** N/A. Because the Chapter 11 Cases have been pending for more than three months without a request for the formation of a creditors' committee, paragraph 10 of the Order does not allocate any portion of the Carve-Out to pay professional fees for any creditors' committee. The Carve-Out does expressly provide for the payment of fees due to the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930.

o.  **Provisions that Subordinate Liens Without Consent.** No.

p.  **Relief from the Automatic On an Expedited Basis and/or Without Further Order of the Court.** Yes. Paragraph 17 of the Order provides that the Bank may seek relief from the automatic stay on an expedited basis if a "Default" occurs under the terms of the Prepetition Financing Documents or the Order. Paragraphs 14 and 29 of the Order provide that the Bank may take actions to collect and apply payments owed to it and may take actions necessary to execute and file all instruments and documents related to the postpetition financing without further order of the Court.

## VI.  <u>Argument</u>

### A.  **The DIP Facility**

26.  Section 364 of the Bankruptcy Code allows the Debtors to: (a) obtain unsecured credit in the ordinary course of business; (b) obtain unsecured credit out of the

ordinary course of business; and (c) obtain credit with specialized priority and/or secured by postpetition liens, if the Debtors cannot obtain postpetition credit on an unsecured basis. The Court may authorize the Debtors to obtain or incur debt, repayment of which is entitled to super-priority administrative expense status or is secured by liens on assets of the estate (including priming liens).

27.    The Debtors propose to obtain financing under the DIP Facility by providing security interests in and liens on postpetition collateral pursuant to section 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the Debtors are "unable to obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code]." *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (the debtor must show "by a good faith effort that credit was not available without" the protections of section 364(c)). Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *In re Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

28.    Additionally, courts have articulated a three-part test to determine whether a debtor is entitled to section 364(c) and (d) financing:

    (a) The debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by merely allowing the lender an administrative claim;

    (b) The credit transaction is necessary to preserve the assets of the estate; and

    (c) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed lender.

29.     As noted above, the need for the Debtors to obtain financing is critical.  A loan facility of the type and magnitude needed in these Chapter 11 Cases could not be obtained on any basis other than under the terms set forth in the DIP Financing Order, *i.e.*, with super-priority claims.  The potential sources of a postpetition credit facility for the Debtors, obtainable on an expedited basis and on reasonable terms, and in light of the positions of the Debtors' prepetition secured creditors, are nonexistent.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Federal Sav. and Loan Ass'n.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

30.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c).  *Id.*; *see also In re Plabell*, 137 B.R. at 900. If few, if any, lenders are likely to have the ability or the willingness to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley*, 99 B.R. 1997, 120 N.4 (N.D. Ga. 1989).

B.        **The Business Judgment Standard**

31.        The Debtors' management has concluded that the DIP Facility constitutes the only alternative available given the circumstances of this case.  Bankruptcy courts routinely defer to the debtors' business judgment on most business decisions, including the decision to borrow money.  *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  A bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

32.        The Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Facility and to use the Cash Collateral.  The terms of the DIP Facility and the use of Cash Collateral are fair and reasonable, were negotiated in good faith and at arms-length, and are in the best interests of the Debtors' bankruptcy estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Facility and borrow funds from the Postpetition Lender on the

secured, administrative super-priority basis described above, pursuant to section 364(c) and (d) of the Bankruptcy Code.

### C.    Proposed Modification of the Automatic Stay

33.    As set forth more fully in the proposed DIP Financing Order, the proposed DIP Facility contemplates a modification of the automatic stay of section 362 of the Bankruptcy Code to permit the Postpetition Lender to: (a) file financing statements, deeds of trust, mortgages, or other similar documents to evidence the Postpetition Lender's security interests under the DIP Financing Facility if necessary or as Lender deems is appropriate; and (b) give the Debtors any notice provided for in the DIP Financing Order.  Additionally, upon the occurrence of a Default, the DIP Financing Order provides that the Bank may seek relief from the automatic stay to take any actions or exercise any remedies the Lender has under the proposed DIP Financing Order or the Prepetition Financing Documents.  Stay modification provisions of this sort are ordinary and usual features of postpetition debtor-in-possession financing facility and, in the Debtors' business judgment, are reasonable under the present circumstances.  The Court accordingly should modify the automatic stay to the extent contemplated by the proposed DIP Financing Order.

### D.    Use of Cash Collateral

34.    Section 363 of the Bankruptcy Code permits a debtor to use cash collateral if parties having an interest in such cash collateral consent or if the court authorizes such use upon other terms.  The Debtors request the Court to approve their use of the Prepetition Lender's Cash Collateral for the purposes set forth in this Motion and the Budget.

35.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor "may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease

in accordance with the provisions of this section." Additionally, section 363(e) provides that, on request of an entity that has an interest in cash collateral to be used, the court may condition such use as is necessary to provide adequate protection of such interest.

36.    The Debtors submit that ample justification exists for the relief requested herein. To ensure an expedient path to reorganization, it is imperative that the Debtors be authorized to use Cash Collateral pursuant to section 363 of the Bankruptcy Code. The Lender has consented to such use on the terms and conditions of the DIP Financing Order. Under the circumstances, use of Cash Collateral, and entry of the DIP Financing Order, are appropriate.

**E.    Good Faith**

37.    Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority"). *See also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of section 364(e) is to allow a good-faith lender to rely upon conditions at the time they extend credit and to encourage [lenders] to lend to bankrupt entities."). The DIP Facility, as described in the DIP Financing Order, is the result of good faith and arms-length negotiations, with all parties represented by counsel. The Debtor believes that the terms of the DIP Facility are fair and reasonable under the circumstances, and that the DIP Lenders are entitled to the benefits of section 364(e) of the Bankruptcy Code.

VII.    **Notice**

38.    The Debtors have provided 14 days notice of this Motion to: (a) the Office of the United States Trustee; (b) counsel for the Postpetition Lender; and (c) the Debtors' 20 largest unsecured creditors as set forth in the list filed with the Debtors' petitions.  In light of the nature of the relief requested, the Debtors submit that no further notice is required, and the Debtors request that the Court find that such notice is sufficient

**Conclusion**

WHEREFORE, the Debtors respectfully requests that the Court: (i) enter the DIP Financing Order on an interim basis substantially in the form of <u>Exhibit A</u> attached hereto providing for borrowing and adequate protection on an interim basis; (ii) approve notice of this Motion as sufficient under the circumstances; and (iii) grant such other relief as the Court may deem just and appropriate.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

**RICE PUGATCH ROBINSON & SCHILLER, P.A.**
Proposed Counsel for the Debtor in Possession
101 NE 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Telephone:    (954) 462-8000
Facsimile:    (954) 462-4300

By: <u>/s/ Chad P. Pugatch</u>
    CHAD P. PUGATCH
    Florida Bar No.:  220582
    CRAIG A. PUGATCH
    Florida Bar No.: 65338

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S. Mail to First American Bank and the **List of 20 Largest Unsecured Creditors** attached hereto and via the Court's CM/ECF system to the parties who receive notice by this method this 22nd day of March, 20110.

By: /s/  Chad P. Pugatch

J:\Wpdocs\4348 Carpenter Contractors\005 Carpenter Contractor Of America - Chapter 11\Pleadings\Cash Collatereal Motion Of 3-22-11.Docx

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:

CARPENTER CONTRACTORS OF
AMERICA, INC., d/b/a R & D THIEL, et al.

            Debtors.

Case No. 10-B-42604-RBR
(Jointly Administered)

Chapter 11

_____

**ORDER (1) AUTHORIZING DEBTORS IN POSSESSION
TO OBTAIN POSTPETITION FINANCING; (2) AUTHORIZING USE
OF CASH COLLATERAL; (3) PROVIDING ADEQUATE
PROTECTION; AND (4) GRANTING LIENS, SECURITY
INTERESTS AND SUPERPRIORITY CLAIMS**

Upon the motion (the "Motion") of Carpenter Contractors of America, Inc. d/b/a R & D

Thiel ("Carpenter Contractors") and CCA Midwest, Inc. ("CCA" and, together with Carpenter

Contractors, the "Debtors") for the entry of an Order pursuant to sections 105, 361, 362, 363,

364, and 507(b) of the Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"),

Federal Rule of Bankruptcy Procedure 4001, and Local Rule 4001 authorizing them to (i) obtain

postpetition financing pursuant to section 364 of the Bankruptcy Code from First American Bank

**EXHIBIT**

_A_

(the "Bank," and in its capacity as prepetition lender, the "Prepetition Lender" and in its capacity as postpetition lender, the "Postpetition Lender"), subject to the terms and conditions set forth herein, (ii) use cash collateral, (iii) grant security interests, mortgages and other liens and super-priority claims to the Postpetition Lender (including a priority lien pursuant to section 364(c)(1) of the Bankruptcy Code, and claims, liens and security interests pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code), and (iv) grant security interests, mortgages and other liens and super-priority claims in order to provide adequate protection to the Prepetition Lender, all as more fully set forth herein, and upon the proceedings held before this Court and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS:

A.    On October 25, 2010 (the "Petition Date"), Carpenter Contractors filed a voluntary petition under chapter 11 of the Bankruptcy Code.

B.    On October 26, 2010, CCA filed a voluntary petition under chapter 11 of the Bankruptcy Code.

C.    On October 27, 2010, the Court entered an order providing for the joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 (DE #24).

D.    The Debtors have continued as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  The Court has not directed the appointment of a trustee or examiner in these cases, no party in interest has requested the appointment of a trustee or examiner, and the United States Trustee has not yet formed an official creditors' committee.

E.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D) and (M).  Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408.

2

F.        The Debtors and the Postpetition Lender have stipulated that pursuant to (a) the Senior Secured Credit Agreement dated July 11, 2008 (as amended, modified or supplemented the "Prepetition Loan Agreement"), by and among the Debtors as borrowers and the Bank in its capacity as the Debtors' Prepetition Lender, and (b) related agreements and documents (collectively, with the Prepetition Loan Agreement, the "Prepetition Financing Documents"), the Bank as Prepetition Lender made certain loans and other financial accommodations to the Debtors to, among other things, finance and fund the Debtors' business and operations.  As of February 15, 2011, the aggregate amount of $10,227,574.53 was outstanding in respect of loans made by the Bank as Prepetition Lender to the Debtors pursuant to the Prepetition Financing Documents, including, but not limited to, (i) attorneys' fees incurred in connection therewith as provided in the Prepetition Financing Documents, and (ii) letters of credit that remain outstanding as of the date hereof and that were issued pursuant to the Prepetition Financing Documents as additional credit support for the Debtors' obligations under Industrial Revenue Bonds related to the Debtors' facilities in Belvidere and Fayetteville (the "Letter of Credit Facilities"), but excluding accrued interest incurred prior to the Petition Date which the Debtors have already paid in full (collectively, the "Prepetition Indebtedness").  For purposes of this Order, each of the terms "Postpetition Loans" (as hereinafter defined) and "Prepetition Indebtedness" shall include the principal of, and all interest, fees, expenses and other charges owing in respect of, such loans, indebtedness or other financial accommodations (including contingent reimbursement and other obligations in respect of such letters of credit), including any reasonable attorneys', accountants' and financial advisors' fees, expenses and charges that are chargeable or reimbursable under the relevant agreements, documents and instruments relating to such loans or other indebtedness.  The Debtors have stipulated that they are

3

individually and jointly and severally liable for the Prepetition Indebtedness, and that they will continue to be individually and jointly and severally liable for all amounts advanced under the Prepetition Financing Documents and this Order.

G.    The Debtors and the Postpetition Lender have stipulated that to secure the Prepetition Indebtedness, the Debtors granted to the Prepetition Lender, pursuant to various security agreements, pledge agreements, and other agreements, liens and security interests in substantially all of their personal property and real property, wherever located, then owned or thereafter acquired or arising, including, but not limited to, (i) equipment, (ii) fixtures, (iii) inventory, (iv) documents, (v) instruments, (vi) accounts, (vii) general intangibles, (viii) deposit accounts, (ix) cash, (x) real property commonly described as 2340 Newburg Road, Belvidere, Illinois, (xi) real property commonly described as 190 Gillis Hill Road, Hoke County, Fayetteville, North Carolina, and (xii) the proceeds, products, rents and profits of all of the foregoing (all of the foregoing collateral described above, together with all of the proceeds, products, rents and profits thereof shall be referred to herein collectively as the "Prepetition Collateral," and the Bank's liens and security interests therein as Prepetition Lender shall be referred to herein as the "Lender's Prepetition Liens").

H.    **Findings Regarding Validity of Liens/Indebtedness.**   The Debtors and the Postpetition Lender have stipulated that all cash of the Debtors wherever located on the Petition Date represented either proceeds of loans from the Prepetition Lender to the Debtors or proceeds of Prepetition Collateral.   Pursuant to the Prepetition Financing Documents, the Prepetition Lender has a first, valid and perfected security interest in and lien on all cash of the Debtors, and these funds constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

4

I.      **Findings Regarding Validity of Liens/Indebtedness.**   The Debtors and the Postpetition Lender have stipulated that subject to paragraph 19 of this Order, the Lender's Prepetition Liens constitute valid, binding, enforceable and perfected first priority liens subject to liens described in or otherwise permitted by the Prepetition Loan Agreement, and are not subject to avoidance or subordination (except insofar as such liens are subordinate to certain liens permitted by the Prepetition Loan Agreement that are valid, binding, enforceable and in existence on the Petition Date and the "Carve-Out" (as hereinafter defined) in accordance with the provisions of this Order) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors believe that the Prepetition Indebtedness constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), that no offsets, defenses or counterclaims to the Prepetition Indebtedness exist, and that no portion of the Prepetition Indebtedness is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.   Notwithstanding anything herein to the contrary, nothing in this Order shall allow the Bank to prime any *ad valorem* tax, purchase money security interest or true lease interest that would have given such creditor a senior lien or interest under applicable non-bankruptcy law as of the Petition Date.

J.      The terms of the proposed financing are fair, reasonable and in the best interests of the Debtors' estates.  The Bank has agreed to provide the Debtors with exit financing in the form of (a) a one-year $5,120,000 monitored asset based line of credit ("Exit Financing Line of Credit"), and (b) a $2,500,000 term note ("Exit Financing Term Note"), repayable in 36 monthly installments.  Amounts advanced under the Line of Credit and the Exit Financing Term Note will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of

6.0%).  Advances under the Exit Financing Line of Credit will be limited to the lesser of (i) $5,120,000 or  (ii) 80% of all eligible accounts receivable and  35% of all eligible inventory (with a cap on inventory advances of $2,000,000) (the "Exit Facility").  The Exit Facility will be documented in accordance with the Bank's standard commercial loan documents that are substantially similar to the Prepetition Financing Documents; provided, however, that, as set forth more fully in paragraph 33 of this Order, the Exit Facility will include provisions that require the Debtors to use a "lockbox" and enter into an agreement substantially in the form of Exhibit B attached hereto.  The Exit Facility will provide the Debtors with sufficient working capital and liquidity to formulate a chapter 11 plan of reorganization and emerge from bankruptcy, and will further permit the Debtors to pay down their existing indebtedness.  Paying down the Debtors' current indebtedness will further benefit the Debtors and their estates by reducing the amount of interest that the Debtors currently pay on account of their cash on deposit.  The Debtors are unable to obtain similarly beneficial financing from any other source.

K.    An immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their business.  Without such funds, the Debtors will not be able to pay their payroll and other direct operating expenses and obtain goods and services needed to carry on their business during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates, creditors, customers, suppliers and employees.  At this time, the Debtors' ability to finance their operations and the availability to them of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations are vital to the confidence of the Debtors' vendors and suppliers of other goods and services, to their customers, and to the preservation and maintenance of the going concern value of the Debtors' estates.  The Debtors are unable to obtain the required funds in the form of

unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1), or debt secured as described in section 364(c)(2) or (3) except as set forth herein.

L.    The Prepetition Lender asserts, and the Debtors believe, that except for the "Excluded Collateral" (as hereinafter defined), the Prepetition Collateral which comprises substantially all of the Debtors' other assets is subject to the Lender's Prepetition Liens. The Bank as Prepetition Lender objects to any further use of the Prepetition Collateral by the Debtor, including the Cash Collateral (as hereinafter defined), except under the terms of this Order.

M.    The Prepetition Lender has indicated a willingness to consent and agree to the Debtors' entering into the financing arrangements contemplated by this Order, and the Postpetition Lender is willing to provide the additional financing contemplated herein, all subject to the conditions set forth herein and in the Prepetition Financing Documents (as amended hereby and subject to the terms hereof) and the provisions of this Order assuring that the "Postpetition Liens" (as hereinafter defined) and the various claims, super-priority claims and other protections granted pursuant to this Order will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated by this Order. The Postpetition Lender and the Prepetition Lender have acted in good faith in consenting to and in agreeing to provide the postpetition financing contemplated by this Order. The reliance of the Postpetition Lender and the Prepetition Lender on the assurances referred to above is in good faith pursuant to 11 U.S.C. § 364(e).

N.     Pursuant to the Bankruptcy Code and in light of the foregoing, the Debtors are required to provide adequate protection to the Prepetition Lender against any diminution in value of the Prepetition Collateral from and after the Petition Date.  The treatment requested by the Debtors for the Prepetition Lender and provided by this Order will minimize disputes and litigation over collateral values, priming of liens, use of cash collateral, and the need to segregate the Prepetition Collateral and the proceeds thereof from the "Postpetition Collateral" (as hereinafter defined) and the proceeds thereof.

O.     Notice of the hearing on the Motion and this Order has been provided to counsel to the Prepetition Lender, the United States Trustee, all parties known to the Debtors to have liens on or security interests in any of the Debtors' assets, and the 20 largest unsecured creditors of the Debtors for which the Debtors have contact information.  Such notice constitutes sufficient notice under Bankruptcy Rule 4001 and no other notice need be given.

P.     Good cause has been shown for the entry of this Order.  Among other things, entry of this Order will minimize disruption of the Debtors' business and operations and permit them to meet payroll and other operating expenses, obtain needed supplies and retain customer and supplier confidence by demonstrating an ability to maintain normal operations.  The financing arrangement authorized hereunder is vital to avoid immediate and irreparable harm to the Debtors' estates.  Consummation of such financing, therefore, is in the best interests of the Debtors' estates.

Q.     The financing and adequate protection arrangements authorized hereunder have been negotiated in good faith and at arms-length between the Debtors and the Bank as Postpetition Lender and Prepetition Lender.  The terms of such financing and adequate protection arrangements are fair and reasonable under the circumstances, reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. Therefore, the Debtors, the Prepetition Lender and Postpetition Lender are entitled to the protections provided by section 364(e) of the Bankruptcy Code.

R.      The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted herein to allow the Debtors to enter into the postpetition financing arrangement as set forth herein and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. The Court concludes that entry of this Order is in the best interests of the Debtors and their estates and creditors, as its implementation will, among other things, allow for the continued operation and rehabilitation of the Debtors' existing business and the implementation of the reorganization or sale of the Debtors' business.

THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Debtors are authorized to borrow money and the Postpetition Lender is authorized to make loans pursuant to the terms of this Order and the provisions of the Prepetition Financing Documents (except as otherwise set forth herein) and perform their obligations hereunder and thereunder, in accordance with, and subject to, the terms of this Order, in compliance with and for the purposes of funding those expenses set forth in the monthly budget attached hereto as Exhibit A (the "Budget"). The Debtors are authorized to borrow funds pursuant to this Order and, subject to the approval of the Postpetition Lender, the Debtors may borrow (I) $2,500,000 in the form of a term note, which will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%) (the "DIP Term Note"), and (II) the lesser of (a) "Loan Limit" or (b) the "Advance Rate" (the "DIP Line of Credit" and, together with the DIP Term Note, the "DIP Facility"). The "Loan Limit" is $5,120,000. The "Advance Rate" is the sum of 80% of all eligible accounts receivable and 35% of all eligible

9

inventory (provided that the cap on inventory advances is $2,000,000). The Debtors shall repay such loans by turning over their cash collateral to the Postpetition Lender as provided herein and then drawing down on their line pursuant to the Budget. On each day that the Debtors require funds and wish to draw down on their line, the Debtors shall submit a draw request to the Postpetition Lender to obtain such funds; the draw request shall be in a form acceptable to the Postpetition Lender. The determination of compliance with the Budget shall be made on a month-ending basis for each month until the occurrence of a "Termination Event" (as hereinafter defined) for which there is not a "Non-Termination Notice" (as hereinafter defined). The Debtors may not exceed by more than 15% any expense item of the Budget nor exceed by more than 15% the aggregate amount of expenses provided for in the Budget on a cumulative basis commencing April 5, 2011; provided, however, that these limitations may be amended by (a) agreement of the Debtors and Postpetition Lender, and the Postpetition Lender will give deference to expenses attributable to increased sales in considering any such proposed amendment, or (b) Court order upon notice and motion. Likewise, the Debtors may not fall short by more than 15% of the revenue on a cumulative basis commencing April 5, 2011. Additionally, for any four-week period, the Debtors may not expend Cash Collateral for any payments or expenses related to the airplane leased by the Debtors in excess of $10,000 over and above net revenues generated by any air charter operations during such four-week period. The Debtors also agreed to allow the Bank to conduct quarterly audits upon reasonable notice and at convenient hours and that the Debtors shall pay the Bank the usual and customary fee for such audits that the Debtors had paid the Bank during the prepetition period; provided, however, that the Bank may conduct such other audits as the Bank reasonably believes to be necessary, and that the Debtors shall pay the Bank the usual and customary fee for such additional audits. The

Bank estimated that the cost of an individual audit is approximately $15,000, which includes the travel expenses of the auditor.  The Debtors are authorized to enter into such non-material modifications and amendments to the Budget without further Court order as may be agreed upon in writing by the Debtors and the Postpetition Lender.  Notwithstanding any other provision of this Order, the Postpetition Lender shall not have any obligations or commitments to make Postpetition Loans (as defined hereinafter) pursuant to this Order until the conditions precedent provided for herein have been satisfied and this Order has become a final order not subject to an appeal.

2.    **Findings Regarding Validity of Liens/Indebtedness; Wavier of § 506(c) Rights.**  Subject to the orders of this Court and the Bankruptcy Code, the terms of the Prepetition Financing Documents are hereby ratified and approved and shall continue in full force and effect with respect to the Prepetition Indebtedness, Postpetition Indebtedness, Prepetition Collateral and Postpetition Collateral.  Except to the extent that other secured consensual and non-consensual creditors held security interests or liens which were superior to the Bank's liens or security interests under non-bankruptcy law as of the Petition Date, the Bank's liens and security interests are not subject to subordination and, subject to paragraph 19 of this Order, the liens and security interests granted to the Prepetition Lender by the Debtors shall constitute first, paramount, enforceable and valid liens upon and security interests in the Prepetition Collateral and are not and shall not be subject to any claims, set-offs or defenses by the Debtors.  In consideration for the Postpetition Lender's and the Prepetition Lender's performance hereunder, the surcharge provisions of section 506(c) of the Bankruptcy Code and the enhancement of collateral provisions of section 552 of the Bankruptcy Code shall not be imposed upon the Prepetition Lender or the Postpetition Lender or any of their collateral.  In further consideration for the

11

Postpetition Lender's and the Prepetition Lender's performance hereunder, effective immediately upon entry of this Order, but subject to paragraph 19 hereof, the Debtors and their respective successors and assigns, shall without further action or court order, be deemed to have released the Prepetition Lender from any and all rights, claims, liabilities and causes of action that the Debtors may have against the Prepetition Lender and which arose prior to the entry of this Order

    3.     From and after the date hereof (the "Effective Date") until: (a) the indefeasible payment in full in cash of the Postpetition Loans, and satisfaction of the Prepetition Indebtedness; and (b) the termination of any commitments or obligations under this Order and/or any financing documents executed subsequent to the date hereof in connection with the Postpetition Loans, the Debtors are hereby authorized and directed to remit, and shall remit to the Bank as Postpetition Lender immediately upon the Debtors' receipt thereof, all "cash collateral" (as defined in Bankruptcy Code section 363(a)) in its possession or control arising from, or constituting proceeds of, the Prepetition Collateral or the Postpetition Collateral, including, but not limited to, all funds contained in all of its deposit accounts on the Petition Date (the "Cash Collateral"). Cash Collateral shall be remitted to the Postpetition Lender in accordance with the terms of the Lockbox Agreement attached hereto as Exhibit B and shall be applied as and to the extent specified in paragraph 4 hereof. For purposes of this Order, "proceeds" of any collateral shall mean proceeds (as defined in the Illinois Uniform Commercial Code) of such collateral as well as: (x) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of the Debtors from time to time with respect to such collateral; (y) any and all payments (in any form whatsoever) made or due and payable to the Debtors in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such collateral by any governmental body, authority, bureau or agency (or

any person under color of governmental authority); and (z) all other payments, dividends, interest or other distributions on or in respect of any such collateral.

4.    **Roll-up of Prepetition Debt or Use of Postpetition Loans to Pay Prepetition Debt.**  From and after the Petition Date, any payments by the Debtors to the Bank shall be applied as follows:

> (i)    First, to accrued, unpaid interest, costs, expenses and protective advances made by the Bank that accrued on the Prepetition Indebtedness after the Petition Date; [1]
>
> (ii)    Second, to the principal amount of the Prepetition Indebtedness;
>
> (iii)    Third, to accrued, unpaid interest, costs, expenses and protective advances made by the Bank that accrued on the Postpetition Loans; and
>
> (iv)    Fourth, to the principal amount of the DIP Line of Credit.

5.    Any and all payments or proceeds remitted, or deemed to be remitted, to the Bank pursuant to the provisions of paragraph 4 of this Order (or any similar provisions of the Prepetition Financing Documents) shall be received, or deemed received by the Bank, as applicable, free and clear of any claim, charge, assessment or other liability including, without limitation, any such claim or charge arising out of or based on sections 506(c) or 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtor.

6.    From and after the Effective Date through the occurrence of a Termination Event for which there is not a Non-Termination Notice, and subject to this Order's terms and

---

[1] In the event that this Court should determine that the amount of the Prepetition Indebtedness exceeded the value of the Prepetition Collateral as of the Petition Date, any amounts applied toward the obligations set forth in paragraph 4(i) shall be recharacterized as having been applied to satisfy the obligations set forth in paragraph 4(ii)-(iv).

conditions, the Debtors are hereby authorized to borrow and re-borrow funds pursuant to the terms and provisions of this Order and the Prepetition Financing Documents.

7.    The Debtors are hereby authorized and directed to cause all collections of Cash Collateral to be administered according to the terms set forth in the Lockbox Agreement attached hereto as Exhibit B, and as more fully set forth in paragraph 33 of this Order.  In addition, the Debtors shall maintain all of their bank accounts, whether deposit accounts or otherwise, with the Bank. The Debtors shall not maintain any other accounts without the express written consent of the Postpetition Lender.

8.    **Grant of Liens on Property of the Estate.** As security for all loans, advances and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtors to the Postpetition Lender (all such loans, advances, indebtedness or obligations, including the DIP Facility, are the "Postpetition Loans"), the Postpetition Lender is hereby granted valid, binding, enforceable and perfected liens, security interests, and mortgages (the "Postpetition Liens") on all currently owned or hereafter after acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (other than the Excluded Collateral), including, without limitation, all real property, all equipment, inventory, cash, goods, accounts, inventory, cash-in-advance deposits, deposit accounts, general intangibles, deposit accounts, real estate, machinery, equipment, vehicles, trademarks, trade names, licenses, claims and causes of action, rights to payment including tax refund claims, insurance proceeds and tort claims, avoidance actions under chapter 5 of the Bankruptcy Code, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "Postpetition Collateral"), in each case subject only to: (i) the Carve-Out; and (ii) consensual and

14

non-consensual security interests or liens that were superior to the Bank's liens or security interests under non-bankruptcy law as of the Petition Date with respect to property subject to such superior liens the Bank shall have a junior lien. "Excluded Collateral" shall have the same meaning as used in the Credit Agreement except that Excluded Collateral shall also include the Debtors' real property located at 3900 Avenue G, N.W., Winter Haven, FL 33880.

9.    **Grant of Liens on Property of the Estate;**    As adequate protection, the Prepetition Lender and the Postpetition Lender are hereby granted valid, binding, enforceable and perfected liens (the "Adequate Protection Liens") in all Postpetition Collateral to secure an amount of Prepetition Indebtedness (the "Adequate Protection Obligations") equal to the aggregate amount of diminution in value of the Prepetition Collateral, whether by depreciation, use, sale, loss decline in market price or otherwise. The Adequate Protection Liens are subject only to: (i) the Postpetition Liens; (ii) the Carve-Out; and (iii) any consensual or non-consensual liens or security interests existing on or in the Postpetition Collateral that are valid, binding, enforceable and perfected liens on the Petition Date, that are not otherwise subject to avoidance or subordination, and that would have had a higher priority than the Prepetition Lender's liens as of the Petition Date.

10.    Except as expressly set forth in this Order, the liens and security interests granted in this Order shall not be: (a) subject to any lien which is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; or (b) subordinated to or made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise. Notwithstanding the above, the liens and security interests granted in this Order and pursuant to the Prepetition Financing Documents shall be subject and subordinate to the "Carve-Out." The Carve-Out is hereby defined as follows: (1) amounts payable to the United States Trustee

pursuant to 28 U.S.C. § 1930(a) and fees to the Clerk of Court; (2) the payment of *ad valorem* taxes; and (3) the payment of unpaid professional fees, costs and expenses of the Debtors' attorneys, accountants, investment bankers, financial advisors or other professionals retained by any of the Debtors ("Professional Expenses"), but only to the extent that such Professional Expenses: (A) were not incurred in the prosecution of claims, causes of action, actions or proceedings against the Prepetition Lender in respect of the Prepetition Indebtedness or otherwise; (B) do not exceed an amount equal to the lesser of (x) the amount thereof projected to be incurred or accrued through such date in the Budget then in effect (but as to any particular professional, only such amount set forth in such Budget for such professional), (y) the amount thereof actually allowed by the Bankruptcy Court, and (z) $100,000 (exclusive of any prepetition retainers held by such Professionals); provided, however, that in no event shall any of the Carve-Out include any fees or expenses arising after the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

     11.    In addition, (a) the Postpetition Loans shall have priority in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), or 726 of the Bankruptcy Code ("Super-priority"), subject only to the Carve-Out, and (b) the Adequate Protection Obligations shall have Super-priority, subject only to the Carve-Out and the aforementioned Super-priority of the Postpetition Loans. Except for the Carve-Out, no costs or administrative expenses which have been or may be incurred in these Chapter 11 Cases, in any conversion of either of these Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related thereto, and no priority claims, including, without limitation, any other Super-priority claims, are or will be prior to or on a parity with the claims of the

Postpetition Lender against the Debtors arising, as applicable, out of the Postpetition Loans or Adequate Protection Obligations or any provision of this Order or with the liens and security interests granted herein on, in and to the Postpetition Collateral.

12.     The Postpetition Loans shall become due and payable, without notice or demand, on the Termination Date, as provided herein unless the Postpetition Lender issues a Non-Termination Notice.  From and after the Termination Date, the Debtors shall have no authority to use Prepetition Collateral (including Cash Collateral) of the Prepetition Lender or Postpetition Collateral of the Postpetition Lender.

13.     From and after the Effective Date, the proceeds of the Postpetition Loans, the Prepetition Collateral, and the Postpetition Collateral shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise disbursed except for: (a) those expenses, payments, and/or disbursements that are expressly set forth in the Budget or otherwise expressly permitted under this Order; (b) compensation and reimbursement of expenses allowed by this Court, but in no event greater than the Carve-Out to attorneys, accountants, investment bankers, financial advisors or other professional persons retained by the Debtors; and (c) amounts due to the Prepetition Lender and Postpetition Lender and their accountants, attorneys or other professionals hereunder which amounts shall be reasonable, but shall not otherwise be subject to the approval of this Court; provided that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in the preceding clauses (a) or (b) and shall not affect the right of the Prepetition Lender or the Postpetition Lender to object to the allowance and payment of such amounts.  No consent by the Postpetition Lender or the Prepetition Lender to any administrative claims, including fees and expenses of professionals, sought to be assessed against or attributed to the Postpetition Lender or the Prepetition Lender or their respective

interests in the Prepetition Collateral or the Postpetition Collateral pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise by, through or on behalf of the Debtors, shall be implied from any action, inaction or acquiescence by the Prepetition Lender or the Postpetition Lender or otherwise.  Except as set forth in the first sentence of this paragraph 13, neither the Prepetition Lender nor the Postpetition Lender has consented or agreed to the use of the proceeds of the Postpetition Loans, Prepetition Collateral or the Postpetition Collateral.

14. **Relief from the Automatic Stay Without Further Order of Court.**  The automatic stay extant under Bankruptcy Code section 362(a) shall be, and it hereby is, modified to the extent necessary to permit the Prepetition Lender and the Postpetition Lender to retrieve, collect and apply payments and proceeds in respect of the Prepetition Collateral and the Postpetition Collateral in accordance with the terms and provisions of this Order.

15. Notwithstanding anything herein, unless the Postpetition Lender issues a notice to the contrary (a "Non-Termination Notice") the Debtors shall no longer, pursuant to this Order or otherwise, be authorized to borrow funds hereunder or to use Cash Collateral or any proceeds of the Postpetition Loans already received (and any obligation of the Postpetition Lender to make loans or advances hereunder shall be terminated) upon the earliest to occur of any of the following events (any such event shall be referred to as a "Termination Event" and the date of any such event for which there is not a Non-Termination Notice shall be referred to as the "Termination Date"):

(a) material non-compliance by the Debtors with any of the terms, provisions or covenants of this Order;

(b) any new or additional "Default" (as defined in the Prepetition Financing Documents) under the Prepetition Financing Documents first occurring subsequent to the entry of this Order shall have occurred and be continuing beyond any applicable cure period;

(c) the Maturity Date (as hereinafter defined); or

(d)     the failure to make any required payment on the Debtors' obligations on account of the Letter of Credit Facilities.

16.     All obligations and commitments of the Prepetition Lender and the Postpetition Lender hereunder shall terminate at the earliest to occur of the following (the "Maturity Date"): (a) November 1, 2011; (b) the effective date of any plan of reorganization or liquidation in these Chapter 11 Cases; (c) conversion of either of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (d) appointment of a trustee in either of these Chapter 11 Cases; or (e) dismissal of either Chapter 11 Case.

17.     Upon the occurrence and during the continuation of any Default (under the Prepetition Financing Agreements or this Order), the Bank may seek on an expedited basis an order from this Court vacating and modifying the automatic stay provisions of section 362 of the Bankruptcy Code to the extent necessary to permit the Bank to exercise all rights and remedies provided in the Prepetition Financing Agreements and to take any or all of the following actions: (a) immediately terminate the Debtors' use of Cash Collateral; (b) immediately set off any and all amounts in accounts maintained by the Debtors with the Bank against the Prepetition Obligations; and (c) take any other actions or exercise any other rights or remedies permitted under this Order, the Prepetition Financing Agreements, or applicable law to effect the repayment of the Prepetition Obligations. Neither the Debtors nor any other party shall have the right to contest the Bank's request for an order from this Court vacating and modifying the automatic stay provisions on any basis other than an assertion that no Default has occurred or that such Default is a non-material Default. The rights and remedies of the Bank specified herein are cumulative and not exclusive of any rights or remedies that the Bank may have under the Prepetition Financing Agreements or otherwise.

18.     Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the rights, remedies, benefits and protections provided to the Prepetition Lender and the Postpetition Lender under this Order shall survive the Termination Date.  Upon the Termination Date, the Bank may declare the principal and accrued interest and fees and all other amounts owed to the Postpetition Lender together with all amounts heretofore due the Prepetition Lender immediately due and payable, and the Prepetition Lender and the Postpetition Lender shall have all other rights and remedies provided in the Prepetition Financing Documents and this Order.  Notwithstanding anything herein, no amounts under the Carve-Out, or the proceeds of the Postpetition Loans, or the proceeds of the Prepetition Collateral or the Postpetition Collateral shall be used for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Prepetition Indebtedness or any liens or security interests with respect thereto, or any other rights or interests of the Prepetition Lender or the Postpetition Lender or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code against the Prepetition Lender or the Postpetition Lender; (b) preventing, hindering, or delaying the Postpetition Lender's enforcement or realization upon any of the Collateral; (c) using Cash Collateral or selling any Collateral except as specifically permitted in this Order (including the Carve-Out) or by order of the Bankruptcy Court; (d) incurring indebtedness except as permitted in this Order; or (e) modifying the Postpetition Lender's rights hereunder.

19.     **Findings Regarding Validity of Liens/Indebtedness; Findings that Bind Subsequently Appointed Trustees.**  The findings contained above and the other provisions of this Order shall be binding upon all parties in interest, including, without limitation, any statutory committees appointed in these Chapter 11 Cases.  Upon entry of this Order, (a) the Prepetition

Indebtedness shall be deemed final and indefeasible, not subject to subordination or otherwise unavoidable, (b) the Prepetition Indebtedness shall constitute allowed claims, not subject to subordination or otherwise unavoidable, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case, (c) the Lender's Prepetition Liens on the Prepetition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination or otherwise unavoidable, and (d) the Prepetition Lender, the Prepetition Indebtedness, the Prepetition Financing Documents and the Lender's Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto.  Subject only to the foregoing provisions of this paragraph 19, the Prepetition Lender shall be deemed released of all claims, rights, causes of action or defenses by, and all liabilities owing to, the Debtors, any statutory committee appointed in these Chapter 11 Cases, all of the Debtors' creditors, and any subsequently appointed trustee arising out of or based on any facts or circumstances occurring prior to the date hereof.

20.     The Postpetition Lender and the Prepetition Lender shall be entitled to all of the benefits of section 364(e) of the Bankruptcy Code for all postpetition advances made to the Debtors hereunder.

21.     The Prepetition Lender and the Postpetition Lender shall be entitled to apply the payments or proceeds of the Prepetition Collateral and the Postpetition Collateral in accordance with the provisions of this Order, and in no event shall the Prepetition Lender or the Postpetition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Postpetition Collateral or otherwise.

21

22.     **Waiver of Debtors' Ability to Request Authority to Obtain Credit under § 364.**  Except as provided herein, the Debtors shall pay all employees and employee taxes, sub-contractors, sub-sub contractors, performance or payment bond premiums, and material-men in a timely fashion and pay all postpetition trade creditors according to terms and be prohibited from at any time during the Chapter 11 Cases granting consensual liens on and security interests in the Prepetition Collateral, the Postpetition Collateral or any portion thereof to any other parties pursuant to section 364 of the Bankruptcy Code or otherwise, which liens and security interests, as the case may be, are senior, or on a parity with, or junior to the liens and security interests of the Prepetition Lender or the Postpetition Lender therein.  Except in accordance with the terms of this Order, the Debtors shall be enjoined and prohibited from at any time (a) using the Prepetition Lender's Cash Collateral, (b) using the Postpetition Collateral, and (c) applying to the Bankruptcy Court for an order authorizing the use of the Prepetition Lender's or the Postpetition Lender's Cash Collateral or Postpetition Collateral; provided, however, that nothing contained in this sentence prohibits the Debtors from contesting the Postpetition Lender's determination that a Termination Event pursuant to paragraph 15(a) above has occurred.  Notwithstanding the foregoing, so long as no Default has occurred, the Debtors are permitted to incur postpetition indebtedness to Donald L. Thiel ("Thiel") in an amount of up to $1,000,000 or such other amount as the Debtors and the Postpetition Lender may agree upon; provided, however, that (a) in no event shall the Debtors pay Thiel any amounts on account of any prepetition loans or capital contributions that Thiel made to the Debtors unless and until the Debtors satisfy all amounts owed to the Prepetition Lender and Postpetition Lender, and (b) if a Default shall occur, any amounts the Debtors owe to Thiel on account of such postpetition loans shall be repaid only after the Debtors satisfy all amounts owed to the Prepetition Lender and Postpetition Lender.

23. The Debtors shall execute and deliver to the Prepetition Lender and the Postpetition Lender all such agreements, financing statements, instruments and other documents as the Prepetition Lender and Postpetition Lender may reasonably request to evidence, confirm, validate or perfect the liens and security interests granted pursuant hereto.

24. The Debtors shall permit representatives, agents and/or employees of the Prepetition Lender and the Postpetition Lender to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

25. **Waiver of Non-bankruptcy Law Requirements for Perfecting Liens.** As part of the Debtors' obligations hereunder, and as consideration for the agreement of the Postpetition Lender to provide the Postpetition Loans to the Debtors, the Debtors shall promptly reimburse the Postpetition Lender for its reasonable costs, fees (including reasonable attorneys' fees), charges and expenses to the extent provided for in the Prepetition Financing Documents as the case may be. The Postpetition Lender shall provide monthly notice to the Debtors of all such costs, fees, charges and expenses. All such costs, fees, charges and expenses shall be part of the Postpetition Loans and shall have the same rights, status and priority as the Postpetition Loans. The Postpetition Liens and all other liens and security interests granted herein shall, pursuant to this Order, be, and they hereby are, deemed perfected, and no further notice, filing or other act shall be required to effect such perfection; provided, however, if the Prepetition Lender or Postpetition Lender shall, in its sole discretion, choose to file such mortgages, mortgage amendments, notes, agreements, certificates, financing statements, notices of liens and security interests and other similar documents, all such mortgages, financing statements or similar

documents, the Debtors are directed and authorized to promptly execute and deliver these documents as requested by the Bank, and pay for all costs, charges, taxes and fees incurred by Bank, including counsel fees.    Notwithstanding their actual date of filing or recording, documents to perfect the Bank's security interests as Postpetition Lender shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.  The automatic stay of section 362 of the Bankruptcy Code is hereby vacated to effect the execution, delivery, recording or filing of any documents by the Debtors in connection with the Postpetition Financing extended by the Bank or other financing extended by the Bank covered by this Order.

26.    In making decisions to advance moneys or extend financial accommodations of any nature under this Order or the Prepetition Financing Documents, in administering the Debtors' use of Cash Collateral or any advances, loans, or financial accommodations of any sort under this Order or the Prepetition Financing Documents, or in taking any other action related to or in connection with any of the foregoing, the Prepetition Lender and the Postpetition Lender shall not be deemed to be in control of the operations of the Debtors, an "employer" of any of the Debtors' employees, or to be acting as a "responsible person" or managing agent with respect to the operation or management of the Debtors.

27.    The provisions of this Order shall be binding upon and inure to the benefit of the Prepetition Lender and the Postpetition Lender and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors).

28.    Based on the findings set forth in paragraphs I and M of this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated by this Order, in the event that any or all of the provisions

24

of this Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity and enforceability of any lien, security interest or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the Prepetition Lender or the Postpetition Lender hereunder arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Order, and the Prepetition Lender or the Postpetition Lender, as the case may be, shall be entitled to all of the rights, remedies, privileges and benefits, including the liens and priorities granted herein, with respect to any such claim.

29.    **Relief from the Automatic Stay Without Further Order of Court.**    The Debtors are authorized and directed to do and perform all acts, to make, execute, deliver and file all instruments and documents (including, without limitation, the execution of additional security agreements, mortgages and financing statements) and to pay fees and expenses which may be required or necessary for the Debtors' performance hereunder, including, without limitation: (a) the execution of any postpetition financing documents, and (b) the payment of the fees and other expenses described herein or in such postpetition financing documents as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees and facility fees and reasonable attorneys' fees, financial advisers' and accountants' fees and disbursements. The automatic stay shall not be deemed to apply and shall be lifted as to all such actions and actions taken by or at the direction of Lender in connection the ministerial actions described in this paragraph.

30.     The obligations of the Debtors in respect of the Postpetition Loans shall not be modified or discharged by the entry of an order confirming a plan of reorganization in this case without the written consent of the Bank.

31.     Because the Debtors have stipulated to the amount of the Prepetition Indebtedness, the Bank is not required to file a proof of claim and the Bank is hereby deemed to have a valid and enforceable claim against each of the Debtors' estates in the full amount of the Prepetition Indebtedness.  The Debtors are and shall be individually and jointly and severally liable for the Prepetition Indebtedness and all postpetition amounts the Bank advances pursuant to this Court's orders.

32.     Notwithstanding anything to the contrary herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (a) any of the rights of the Bank under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the Bank to (i) request additional adequate protection of their interests in the Prepetition Collateral or the Postpetition Collateral or relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code, (ii) request conversion of either Chapter 11 Case to chapter 7, and (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, or (b) any other rights, claims or privileges (whether legal, equitable or otherwise) of the Bank.

33.     Notwithstanding the above, nothing in this Order shall bind the Bank to provide financing, including either debtor-in-possession financing or the Exit Facility, on the terms set forth herein unless the Debtors: (a) execute and deliver loan documents related to the Postpetition Loans that are of a form reasonably acceptable to the Bank, including but not limited to documents that will provide for the use of a lockbox; and (b) agree to certain financial

26

covenants that are reasonable and consistent with the parties' past practice, including but not limited to the covenants set forth in the Lockbox Agreement attached as Exhibit B to this Order. In accordance with the Postpetition Loans, Exit Facility and the Lockbox Agreement, the Debtors shall direct all of their customers, clientele, and account debtors to make all payments directly to a post office box (a "Lockbox") designated by, and under the exclusive control of, the Bank; provided, however, that the Debtors may accept checks from customers in return for lien releases. To the extent that the Debtors accept checks from customers in return for lien releases, the Debtors shall deposit such checks with the Bank electronically via remote deposit capture immediately upon receipt of such checks. Each of the Debtors shall establish a Lockbox and a deposit account (each, a "Lockbox Account") in its name with the Bank into which all payments received in the applicable Lockbox shall be deposited. Each Debtor shall also deposit all payments it receives into the appropriate Lockbox Account. All funds deposited into any Lockbox or any Lockbox Account will be swept on a daily basis into a separate deposit account maintained by the Debtors with the Bank and under the exclusive control of the Bank (the "Collection Account"). On each business day, the Bank shall apply funds received into the Collection Account (after a clearance period of three business days applied to those funds) according to the priorities set forth in paragraph 4 of this Order.

34.    This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof. There is no just reason to delay enforcement or appeal of this Order.

###

Submitted by:

Chad P. Pugatch (FL Bar No. 220582)
RICE PUGATCH ROBINSON & SCHILLER, P.A.

27

101 NE 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300

*Counsel to the Debtors*

Attorney Pugatch is directed to serve a copy of this Order on all interested parties and filed a Certificate of Service.

# EXHIBIT B TO BE FILED UNDER SEPARATE COVER



## Lockbox Agreement

This agreement is entered into by and between First American Bank, an Illinois banking corporation (the 'Bank'), 1650 Louis Avenue, Elk Grove Village, Illinois 60007 and
CARPENTER CONTRACTORS OF AMERICA INC  (the 'Customer').

1. **Account Administration.** Bank agrees to open and manage a post office box for the payment of funds into the lockbox account. Bank shall deposit funds into the lockbox account according to the process described in this Agreement. Customer agrees to pay the applicable fees as set forth in the Lockbox Pricing Schedule, which is subject to change without notice. Bank and Customer agree to the following:

   a) Customer shall mail invoices to its clientele in a prompt, businesslike manner.

   b) Bank is entitled to exclusive and unrestricted access to the lockbox contents and has the sole right to direct transfer of the lockbox account amounts.

   c) Prior to deposit into Customer's account, the lockbox contents will not be available to Customer except upon request to Bank and only with Bank's written consent.

   d) Bank will indorse all payments accepted by Bank without the signature of payee and deposit payments into Customer's account.

   e) Bank may delegate its duties or rights under this Agreement to agents. Bank may change the agents to which it delegates these responsibilities.

   f) Bank will process all remittances received by the lockbox before 10:00 a.m. (Central Time) on the same business day. Remittances received on Saturday, Sunday or federal holidays will be processed on the next business day.

2. **Application of Payments.** Customer is responsible for instructing all of its clientele about the requirements specified in this section. Each payment directed to the post office box must be accompanied by an invoice. Bank will open, inspect, and date stamp all lockbox items. Bank or its agents will handle the lockbox contents in the following manner:

   a) Instruments Payable in Foreign Money. Instruments payable in foreign money will be forwarded to Bank by its agents, to be processed according to the then current procedures. Funds will deposited into the lockbox account.

   b) Missing Date. In absence of a check date, Bank may insert the current date with a date stamp and process the check.

   c) Postdated Checks. Bank will have no liability for processing and depositing postdated items into the lockbox account.

   d) Stale Date. Checks dated six months or older may be deposited. Bank will have no liability for processing and depositing stale dated items into the lockbox account.

   e) Signature Missing. If the drawer's signature is missing and the check contains no indication of the identity of the drawer, the check may not be deposited.

   f) Amounts Missing. Checks missing both script and numeral amount will not be deposited. Checks missing either script or numeral amounts may be deposited.

   g) Payment in Full. Checks that read, "Payment in Full," or similar words, will be deposited. Customer must inform its clientele to address any disagreements regarding payment to a location other than the lock box.

Rev 11/09

1



h) Payment Methods.  Bank will recognize checks as acceptable methods of payment for deposit and may reject payment in any other form.

i) Returned Checks.  In the event that a check deposited in Customer's account is returned unpaid because of insufficient funds or uncollected funds, Bank may either redeposit the check or return the check to Customer.  Fees charged by Bank for insufficient or uncollected funds will be debited from Customer's account.

j) Cash Payments.  Bank will recognize cash payments as acceptable methods of payment for deposit.  Customer acknowledges that cash payments will be deposited once per week and are therefore subject to delayed processing and availability. Customer further acknowledges that numerous discrepancies may occur when remittances are made in cash, assumes all such risks, and agrees that Bank has no liability for discrepancies in remittances made in cash.

3  **Account Records.**  Bank shall maintain a copy of each check deposited in the lockbox account.  Reproductions will be available for use by Customer on a reasonable basis.  All lockbox contents delivered to the post office box will be either imaged or copied and retain by or on behalf of Bank in accordance with Bank's record retention procedures.

4.  **Acceptable Payees.**  The Customer shall provide the Bank with a list of acceptable payees. The Bank will verify that each check is made payable to one of the named payees or a reasonable variation thereof.  It is the responsibility of the Customer to maintain this list and provide the Bank with updates as appropriate.  An excessive number of payees may result in a surcharge being assessed.  Refer to the Lockbox Pricing Schedule for specific pricing.

5  **Account Agreement Applicability.**  All lockbox contents processed and credited are subject to the terms and conditions of Customer's deposit account agreement. Each and every provision of the account agreement between Customer and Bank, with respect to Customer's account, will remain in full force and effect.

6.  **Confidentiality.**  The Bank, its employees and agents shall treat all data, records and other information pertaining to Customer or its accounts in strict confidence and shall take all reasonable steps to maintain the confidentiality thereof. Customer, its employees and agents shall maintain the confidentiality of any non- public information that may be acquired as a result of this Agreement.

7.  **Bank Operations.**  It is understood and agreed that the Bank may from time to time and in its sole discretion revise its methods and sequence of operations in the performance of services hereunder. The Bank shall promptly notify the Customer of any such changes that may affect the procedures, reports, or responsibilities of Customer under this Agreement.

8.  **Regulation.**  It is agreed by the parties hereto that services performed for Customer are subject to audit and examination by the appropriate audit, supervisory and regulatory agencies of Customer to the same extent as if such services were being performed by Customer for itself on its own premises. Customer agrees to reimburse Bank for all direct or indirect costs incurred as a result of special services required by any audit, supervisory or regulatory agency pertaining to Customer.

9. **Standard of Care.** In the preparation of lockbox reports and in the performance of services described in this Agreement, the Bank will employ the degree of care and skill as it applies in the conduct of similar matters in its own behalf. Such standard of care shall be deemed, and is hereby accepted and acknowledged by the Customer, to be appropriate for purpose of this Agreement. In the event of an error on the lockbox reports that is attributable to actions, omissions or processes of the Bank in the performance of services described hereunder, the Bank's obligation to the Customer shall be limited to the correction of such error. The Bank shall not be liable to Customer or to third parties for any loss, cost, or damages suffered by Customer or third parties as a result of such error, nor shall the Bank be liable hereunder for any other such loss, damage or expense, except for the correction of such error.

10. **Service Interruption.** The Bank shall not be liable for failure to provide the services described herein, and shall not be deemed in default hereunder, due in whole or in part to failure of transmission or power supply or mechanical or electrical difficulties with equipment. The Bank shall not be liable for failure to provide the services hereunder, and shall not be deemed in default hereunder, if such failure is attributable to causes beyond its control, including, but not limited to, fire, flood, vandalism, malicious mischief, insurrection, riot, civil commotion, actions of civil or military authorities, national emergencies, strikes, quarantine, catastrophes and acts of God.

11. **Liability.** Bank will not be liable for its failure to perform any of its obligations, except in the event of gross negligence or willful misconduct, or that of its employees, officers, or agents. If, as a result of such gross negligence or misconduct, Bank is found liable for mishandling any item, such liability shall be limited to the face amount of the check involved or the amount of Customer's direct loss, whichever is greater as a result of such mishandling, and in no event shall Bank be responsible for any incidental or consequential damages. Bank or its agents shall have no obligation with respect to any item lost, damaged or stolen except when Bank has been grossly negligent or has engaged in willful misconduct. Customer undertakes to obtain a replacement item for any item lost, damaged or stolen and to cause such item to be either delivered to the post office box or deposited in the post office box pursuant to this Agreement.

12. **Indemnification.** Customer agrees to indemnify and hold the Bank harmless from and against all loss, costs, damages, and expenses (including reasonable attorney fees) which the Bank may incur, suffer, or become liable for, or which may be asserted against the Bank arising out of or as a result of this Agreement or the performance by Bank of services hereunder to the extent that such loss, cost, or damage is not the result of the Bank's bad faith, gross negligence or intentional misconduct.

13. **Arbitration.** Either Customer or Bank may, without the other's consent, elect mandatory, binding arbitration of any claim, dispute or controversy raised by either party against the other, arising from or relating in any way to this Agreement, (the "Claim" or "Claims"). All Claims originating from or relating to this Agreement are subject to arbitration, no matter what theory they are based on or what remedy they seek, whether legal or equitable. This includes Claims based on contract, tort (including intentional tort), fraud, agency, negligence, statutory or regulatory provisions, or any other sources of law, or any request for equitable relief.

Rev 11/09

14. **Termination.** This Agreement shall be effective as of the date indicated below and shall remain in effect until terminated by either party giving written notice thirty (30) days in advance of the termination date stated in the notice. The customer will be charged a forwarding fee as set forth in the Lockbox Pricing Schedule and applicable postage charges, for three additional months after the termination date for forwarding mail. Any mail coming to the lockbox after this date will be returned to sender.

15. **Amendment, Integration and Severability.** No amendment or modification of this Agreement is effective unless made in writing. This Agreement represents the final agreement between the parties and may not be contradicted by oral agreements. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will be enforceable. This Agreement is in addition to and not in substitution for any lien or security interest held by Bank with respect to any loan and shall not operate as a merger of any contract or debt or suspend the fulfillment of, or affect the rights, remedies or powers of Bank in respect to any obligation, or security interest held by Bank.

16. **Notices.** All notices provided for in this agreement shall be made in writing, to the address of the party to whom notice is to be given, as set forth in the Bank's records and shall be deemed given as of the date sent. Such notice may be provided electronically via e-mail.

17. **Entire Agreement.** This Agreement contains all of the terms agreed upon by the parties with respect to the subject matter hereof and supersedes all prior Agreements and understandings between the parties, whether oral or written, dealing with such subject matter.

18. **Law Applied.** The Uniform Commercial Code governs this Agreement. This Agreement has been executed in the State of Illinois and shall be construed and governed in accordance with the laws of the State of Illinois.


Dated: _____

(Company)                                          (Bank)
_CARPENTER CONTRACTORS OF AMERICA INC_       **First American Bank**

By: _____         By: _____

Name: _____         Name: _____

Title: _____        Title: _____

SIGN HERE

ALPINE ENGINEERED PRO
PO BOX 3129
CAROL STREAM, IL 60132-3129

ANASCO INC
BOX 1339
ADDISON, IL 60101

~~BILL GIBLIN~~
~~1010 CURTISS, #B2~~
~~Downers Grove, IL 60515~~

BLUELINX CORPORATION
3532 SOLUTIONS CTR
CHICAGO,, IL 60677-3005

CHICAGO CARPENTERS TR
P.O.BOX 94432
CHICAGO, IL 60690

CONSTRUCTION INDUSTRY
P.O. BOX 71031
CHICAGO, IL 60694-1031

First American Bank
1650 Louise Avenue
Elk Grove, IL 60007

DONALD BOETTCHER
409 DOUGLAS STREET
Belvidere, IL 61008

G-PLEX, INC.
PO BOX 2244
TUSCALOOSA, AL 35403

GECF BUSINESS PROPERT
P.O. BOX 402363
ATLANTA, GA 30384-2363

GENERAL ELECTRIC CAPI
P.O. BOX 640387
PITTSBURGH, PA 15264-0387

IMPERIAL CREDIT CORP.
SUITE 500
CARY, NC 27513

ITW BUILDING COMPONEN
P.O.BOX 3129
CAROL STREAM, IL 60132-3129

JIM GUSTAFSON
3150 EAST END
Waukegan, IL 60087

KEN THILMONT
N2020 CITY ROAD, LT 431
Lake Geneva, WI 53147

MANUEL ROBLEDO
1366 BLACKHAWK DRIVE
Elgin, IL 60120

MARSH USA INC.
PO BOX 281404
ATLANTA, GA 30384-0001

SUNCOAST CONTRACTORS
3160 KUTAK ROAD
FORT MYERS, FL 33916

SY'S SUPPLIES, INC.
235 NORTH JOG ROAD
WEST PALM BEACH, FL 33413

WEYERHAUSER
PO BOX 843568
DALLAS, TX 75284-3568

CUSTOM FABRICATIONS
1625 WELD RD, STE G
ELGIN, IL 60123

ADP, INC.
P.O. BOX 78415
PHOENIX, AZ 85062-8415

DDN INDUSTRIES, INC.
SUITE 221
HOFFMAN ESTATES, IL 60169

F&F TIRE WORLD
520 LOGAN AVE
BELVIDERE, IL 61008

HILTI INC.
P.O. BOX 382002
PITTSBURGH, PA 15250-8002

HYPEN SOLUTIONS
P.O. BOX 849936
DALLAS, TX 75284-9936

I.W.I. MOTOR PARTS
155 N CRESCENT RIDGE
DUBUQUE, IA 523

MID-CITY OFFICE PRODU
P.O. BOX 957
ROCKFORD, IL 61105-0957

NEW SUPPLIES CO.
P.O. BOX 129
LEMONT, IL 60439-9998

NEXUS OFFICE SYSTEMS,
898 FEATHERSTONE RD.
ROCKFORD, IL 611763

Brian Fitzsimmons Vice President
Marsh USA, Inc.
1560 Sawgrass  Corporate Parkway
Suite 300
Sunrise, FL 33323

WADE TOOL
5520 W TOUHY UNIT K
SKOKIE, IL 60077

WOLF CHEVROLET
1800 N. STATE ST.
BELVIDERE, IL 61008

Donald L. Thiel
1087 AIA
Pompano Beach, FL 33062

FLA Owner, LLC/EOLA Capital
5405 Cypress Center Drive, Suite 240
Tampa, FL 33619

IKON Financial Services
1738 Bass Road
Macon, GA 31210

VL Properties
1168 Andrea Lane
Ft. Myers, FL 33912

Carpenter Contractors of America, Inc.
 dba R&D Thiel
941 SW 12th Ave.
Pompano Beach, FL 33069