UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

IN RE:                                          CASE NO. 10-42604-RBR
                                                CHAPTER 11
CARPENTER CONTRACTORS                           (Jointly Administered)
OF AMERICA, INC., d/b/a R & D THIEL, and

CCA MIDWEST, INC.,

                        Debtors.

_____/

## DISCLOSURE STATEMENT FOR DEBTORS IN POSSESSION CARPENTER CONTRACTORS OF AMERICA, INC. AND CCA MIDWEST, INC.'S JOINT PLAN OF REORGANIZATION

**RICE PUGATCH ROBINSON & SCHILLER, P.A.**
Attorneys for the Debtors in Possession
101 N.E. Third Avenue, Suite 1800
Ft. Lauderdale, Florida 33301
Telephone No.: 954-462-8000
Facsimile No.: 954-462-4300


By: /s/ Chad P. Pugatch
CHAD P. PUGATCH
Florida Bar No.: 220582
cpugatch@rprslaw.com
CHRISTIAN SAVIO
Florida Bar No.: 0084649
csavio@rprslaw.com

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

PURPOSE OF THIS DISCLOSURE STATEMENT...................................................................1

DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION............2

    Time and Place of the Hearing to Confirm the Plan ........................................................ 2
    Deadline for Voting to Accept or Reject the Plan............................................................ 2
    Deadline for Objecting to the Confirmation of the Plan .................................................. 2
    Contact Information........................................................................................................... 2
DISCLAIMER ...............................................................................................................................3

BACKGROUND ............................................................................................................................ 3
    Description and History of the Debtors' Business ........................................................... 3
    Events Leading to Chapter 11 Filing................................................................................ 4
    Significant Events During the Bankruptcy Case .............................................................. 5
    Project Recovery of Avoidable Transfers ........................................................................ 6
    Claims Objections ............................................................................................................ 6
    Current and Historical Financial Conditions ................................................................... 6
    Insiders of the Debtors...................................................................................................... 6
    Management of the Debtors Before and During the Bankruptcy...................................... 7
SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS
AND EQUITY INTERESTS......................................................................................................... 9
    Purpose of the Plan of Reorganization.................................................................... 9
    Unclassified Claims .................................................................................................. 9
    Administrative Expenses .......................................................................................... 9
    Priority Tax Claims................................................................................................... 9
    Class of Claims and Equity Interests ....................................................................... 9
    Secured Claims ....................................................................................................... 11
    Priority Claims........................................................................................................ 10
    General Unsecured Claims ..................................................................................... 13
    Equity Interest Holders .......................................................................................... 14
    Means of Implementing the Plan ........................................................................... 14
    Source of Payments................................................................................................ 15
    Post-Confirmation Management............................................................................. 15
    Risk Factors ........................................................................................................... 16
    Executory Contracts and Unexpired Leases .......................................................... 16
    Tax Consequences of Plan ..................................................................................... 16
CONFIRMATION REQUIRMENTS AND PROCEDURES..................................................... 17
    Who May Vote or Object........................................................................................ 18
    What is an Allowed Claim or an Allowed Equity Interest ............................................ 18
    What is an Impaired Claim or Impaired Equity Interest ............................................... 18
    Who is Not Entitled to Vote.................................................................................... 18
    Who Can Vote in More Than One Class................................................................. 19
    Votes Necessary to Confirm the Plan .......................................................................... 19

Votes Necessary for a Class to Accept the Plan ............................................................. 19
Treatment of Nonaccepting Classes .............................................................................. 19
Liquidation Analysis ..................................................................................................... 20
Feasibility ...................................................................................................................... 20
Ability to Initially Fund Plan......................................................................................... 20
Ability to Make Future Plan Payments and Operate Without Further Reorganization.. 21
EFFECT OF CONFIRMATION OF PLAN...................................................................................21

Discharge of Debtors..................................................................................................... 21
Injunctions……………………………………………………………………………..21
Modification fo Plan....................................................................................................... 22
Final Decree.................................................................................................................... 22
GENERAL PROVISIONS ..............................................................................................................22

Notices........................................................................................................................... 23
Dates……………………………………………………………………………………23
Further Action ............................................................................................................... 23
Attachments ................................................................................................................... 23
Plan Attachments .......................................................................................................... 23
Binding Effect ............................................................................................................... 23
Governing Law .............................................................................................................. 23
ALTERNATIVES TO CONFIRMATION.......................................................................................23

RECOMMENDATION ....................................................................................................................24

DISCLAIMERS.................................................................................................................................24

## INDEX TO EXHIBITS

Exhibit A –   Debtors' Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code

Exhibit B -   Debtors' Most Recent Financial Statements Issued Before Bankruptcy

Exhibit C -   Debtors' Most Recent Post-Petition Operating Reports

Exhibit D -   [DE #334]; Order (1) Authorizing Debtors in Possession to Obtain Postpetition Financing; (2) Authorizing use of Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims

Exhibit E -   Debtors' Projected Revenues and Expenses

Exhibit F -   Cash on hand on the Effective Date of the Plan

Exhibit G -   Executory Contracts and Unexpired Leases

Exhibit H -   Fifth Third Bank Equipment

Exhibit I -   Liquidation Analysis

**DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE**

I.    **INTRODUCTION**

This is the joint disclosure statement (the "Disclosure Statement") in the chapter 11 case of Carpenter Contractors of America, Inc. d/b/a R & D Thiel ("Carpenter Contractors") and CCA Midwest, Inc. ("CCA Midwest") (collectively the "Debtors"). This Disclosure Statement contains information about the Debtors and describes the Plan of Reorganization (the "Plan") filed by the Debtors on August 31, 2011.   A full copy of the Plan is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one. All defined terms contained in the Plan apply to the Disclosure Statement.*

**THE DESCRIPTION OF THE PLAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SUMMARIZES ONLY CERTAIN PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN. THIS SUMMARY IS NOT INTENDED TO SUBSTITUTE FOR A READING OF THE PLAN OR THE REMAINDER OF THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY. THE PLAN IS A LEGALLY BINDING DOCUMENT AND CREDITORS MAY WISH TO CONSULT WITH THEIR OWN ATTORNEYS, IF ANY, TO UNDERSTAND THE PLAN MORE FULLY.**

**THE TERMS OF THE PLAN AND CONFIRMATION ORDER WILL GOVERN THE RIGHTS OF THE PARTIES, AND PARTIES WITH IMPAIRED CLAIMS ARE THEREFORE URGED TO READ THE PLAN OF REORGANIZATION IN ITS ENTIRETY.**

The proposed distributions under the Plan are discussed at pages 9 - 14 of this Disclosure Statement.

A.    **Purpose of this Document**

This Disclosure Statement describes:

- o   The Debtors and significant events during the bankruptcy case,
- o   How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- o   Who can vote on or object to the Plan,
- o   What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- o   Why the Debtors believes the  Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and

1

    o   The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

## B.    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

    1.    *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, at _____, at the U.S. Bankruptcy Court, 299 E. Broward Blvd., Fort Lauderdale, FL 33301.

    2.    *Deadline For Voting to Accept or Reject the Plan*

After carefully reviewing the Plan, this Disclosure Statement and its exhibits, each holder of a claim, which has been impaired under the Plan, may vote on acceptance or rejection by completing, dating and signing the ballot, which will be mailed to them after the Court approves this Disclosure Statement, and returning it to the Clerk of the Bankruptcy Court at the following address:

**CLERK OF THE COURT**
**U.S. Bankruptcy Court**
**299 E. Broward Blvd**
**1st Floor --- Fort Lauderdale, FL 33301**

**In order to be counted, ballots must be <u>received</u> by the Bankruptcy Clerk no later than 5:00 p.m. Eastern Time on _____, 2011.**

**PLEASE VOTE EVERY BALLOT YOU RECEIVE. Completed ballots for holders of all Claims and Equity Securities should be returned and MUST BE RECEIVED BY THE DEADLINE SET FORTH IN THE ORDER SETTING CONFIRMATION HEARINGS AND OTHER DEADLINES. If you have Claims or Equity Securities Interests in more than one Class under the Plan, you will receive multiple ballots.**

**IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, CALL:**

**Chad P. Pugatch**
**Rice Pugatch Robinson and Schiller, P.A.**
**954-462-8000**

    3.    *Deadline For Objecting to the Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon Counsel for the Debtors in Possession, the United States Trustee, and any parties receiving notice by CM/ECF by _____.

4.    *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact:

**Chad P. Pugatch**
**Rice Pugatch Robinson and Schiller, P.A.**
**Counsel to Debtors In Possession**
**954-462-8000**

C.    **Disclaimer**

*The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.*

The information contained in this Disclosure Statement has been developed based upon review and analysis of Debtors' financial condition and the terms proposed by the Plan. The information contained in this Disclosure Statement has not been subject to audit by independent certified public accountants. The information contained in this Disclosure Statement is believed to be substantially accurate and may be relied upon in formulating a decision to accept or reject the Plan. The books and records of Debtors are not warranted or represented to be complete and historically accurate.

The Plan filed in connection with this Disclosure Statement is an integral part of the Disclosure Statement and each Creditor is urged to review the Plan prior to casting its vote.

All information herein is set forth as required pursuant to 11 U.S.C. §1125 and is not to be construed as a representation by the Debtors or to be used as an admission in any litigation.

II.    **BACKGROUND**

A.    **Description and History of the Debtors' Business**

Carpenter Contractors is an Illinois Corporation with its corporate headquarters located in Florida. Since 1955, Carpenter Contractors has been in the business of providing carpentry services to builders of new homes in Illinois and Florida. Since July 2010, CCA Midwest an affiliate of Carpenter Contractors has been in the business of providing carpentry services to builders of new homes exclusively in Illinois. In addition, Carpenter Contractors manufactures building components and distributes construction materials in the above locations as well as in North Carolina. Carpenter Contractors offers its products and services to major national builders including Pulte Homes, Dell Webb, D.R. Horton, MI Homes, Lennar Homes, Toll Brothers, Ryland Homes, Standard Pacific, K. Hovnanian, David Weekly Homes, and Taylor Morrison and other large local home builders in the above markets. Over its 56 year history, with the exception of the past several years, Carpenter Contractors has enjoyed a long history of growth and profitability.

Carpenter Contractors expanded into Florida in 1973 and into North Carolina in 2001. Carpenter Contractors is distinguishable from its competitors in that it provides three product offerings

consisting of full service carpentry labor, material supply and housing component manufacturing. By providing all three products, unlike its competitors, and its commitment to production efficiency, cost control and safety, Carpenter Contractors has earned a prominent reputation in the construction industry. A glimpse into Carpenter Contractors financials shows a history of steady growth with a substantial increase during the housing boom which is followed by a sharp decrease in mid 2006 through present. However, Carpenter Contractors has shown some revenue growth recently through increased market share.

Carpenter Contractors operates in three locations; the Belvidere, Illinois facility is located on forty-five acres. The Belvidere facility is strategically located to allow distribution to several markets in and around Illinois, including Wisconsin, Indiana and Iowa. This facility contains an indoor lumber yard and manufactures wall panels, roof and floor trusses, and pre-fabricated floor systems. This facility is conveniently located to be serviced by rail and is fully equipped with state of the art computer automated manufacturing equipment. The Belvidere facility allows Carpenter Contractors to deliver materials and components directly to jobsites to be erected by field carpenters, enabling the Carpenter Contractors' competitive advantage of providing all three contracting services.

Carpenter Contractors' next facility is located in Winter Haven, Florida. The facility is located on fifty-four acres. At this facility, Carpenter Contractors manufactures and distributes roof and floor trusses, and wall panel components and engineered wood products to customers. This plant location also supports Carpenter Contractors' field carpenters.

Finally, Carpenter Contractors operates a facility in Fayetteville, North Carolina on ten acres of land. This location strategically services the areas of Charlotte, Raleigh-Durham, Winston-Salem, and Wilmington as well as Myrtle Beach and Columbia, South Carolina. Carpenter Contractors' newest facility manufactures roof and floor trusses and distributes engineered wood products.

CCA Midwest conducts business exclusively in Illinois and provides its customers with non-union carpentry services. CCA Midwest does not have a manufacturing component like that of Carpenter Contractors.

Carpenter Contractors operates in three primary segments of the construction business, the carpentry or labor division; the component manufacturing; and the material supply business. Carpenter Contractors is uniquely situated in that it is the only manufacturer of housing components that employs carpenters to erect the finish product in the field. This enables Carpenter Contractors to craft, refine and deliver a quality final product.

Through the delivery of high quality service and products to national builders, Carpenter Contractors has built a reputation for effectiveness and efficiency which has resulted in long standing and sustainable business relationships with the nation's top home builders and a continuous influx of new business.

B.    **Events Leading to Chapter 11 Filing**

Carpenter Contractors enjoyed over fifty years of profitability and growth until the most significant downturn in the residential housing market since the Great Depression. Never in Carpenter Contractors' 55 years of operations has national new construction declined so abruptly, forcing several of its customers to be in or on the verge of Bankruptcy. The Debtors did manage to survive the initial

impact of the housing market; however, stressed banking relationships with the Debtors' primary secured lender, First American, lead the Debtors into filing when First American began exercising its asserted rights under a $9 million line of credit on a revolving loan, including by directly collecting the Debtors' account receivables. Unable to find alternative financing the Debtors were left with virtually no option but to file chapter 11 in an attempt to renegotiate the revolving line of credit with First American, and to reorganize its debts and structure its operations.

## C.    Significant Events During the Bankruptcy Case

On October 25, 2010 (the "Petition Date"), Carpenter Contractors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On October 26, 2010, CCA Midwest filed a voluntary petition under Chapter 11 of the Bankruptcy Code, case no.: 10-42630-JKO. On October 27, 2010, the Court entered an order providing for joint administration of the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 [DE #24]. The Debtors hired Rice Pugatch Robinson and Schiller, P.A. as counsel to the Debtors in Possession as set forth in the Application to Employ Chad P. Pugatch and Rice Pugatch Robinson and Schiller, P.A. as Counsel for the Chapter 11 Debtors [DE 15].

Shortly after the filing of the petition, Carpenter Contractors filed the only adversary complaint to date in this case against the State of Illinois Worker's Compensation Commission for injunctive relief [DE #1, case no: 10-03692-RBR]. The Court entered a temporary restraining order, and the parties shortly thereafter entered a compromise resolving the adversary complaint. On January 13, 2011, the case was ordered closed.

During the course of the Chapter 11 case, Carpenter Contractors has focused its efforts on three primary issues: (1) remedying its relationship with First American; (2) renegotiating terms of the collective bargaining agreements with one of its unions and negotiating disposition of union withdrawal liability with three other unions pension funds; and (3) determining a proper plan of action regarding the ownership of a corporate aircraft by a wholly owned subsidiary and related loan guaranty to Wells Fargo Bank, N.A. Majority of the issues were resolved outside the courtroom and without judicial determination. The Debtors have negotiated, modified, and resolved all the issues with First American and plans for First American to provide financing going forward.[1]

The Debtors at the time of the petition were self-insured for worker's compensation and to ensure stability, the Debtors requested and the Court grant relief to pay prepetition claims of worker's compensation for the State of Florida and Illinois. See [DE #67]. Such payments were made pursuant to state requirements.

The Debtors on November 9, 2010, filed a motion for authorization to pay critical vendors and the Court granted such relief. See [DE #59 & #88]. Pursuant to such order all critical vendors have been paid including SY's Supplies; White Cap Construction; Parksite; Weyerhaeuser; Bluelinx; Preferred Materials, Inc.; Imperial Credit; Cemex; Sun Coast; and American Express. The Debtors on November 23, 2011 filed a second motion for authorization to pay critical vendors and to pay additional amounts to approved critical vendors Cemex and American Express which the Court granted. See [ DE #127 & 167]. Pursuant to the order the Debtors paid the additional critical vendors

---

[1]    The Court's order (1) authorizing debtors in possession to obtain post-petition financing; (2) authorizing use of cash collateral; (3) providing adequate protection; and (4) granting liens, security interests and super-priority claims provides the terms and conditions of exit financing agreed to between First American and the Debtor. See ¶I. J. [DE #334].

of MJS Nursery; J. Brush Bobcat; Allied Crane; Beyel Bros. Crane & Riggin; Harvest Crane Rental, Inc.; Frazee Bobcat Service, Inc.; AAA Steel Fabricators, Inc.; Adonel Concrete Palm Beach, Inc.; Bless and Construction Glass Block Warehouse, Inc.; L Jones & Son Concrete Pump; Modern Concrete, Inc.; Stuart Paint & Supply, Inc.; Advantage Pest Related Services and paid the additional amounts to Cemex and American Express.

Carpenter Contractors has renegotiated several terms and entered into a new collective bargaining agreement with Chicago Regional Council of Carpenters, Affiliated Local Union 792 of the United Brotherhood of Carpenters and Joiners of America "Manufacturing Plant Carpenters". [*See* DE #359]. Further, Carpenter Contractors has negotiated and entered into a modified collective bargaining agreement with General Chauffeurs, Helpers and Salesdrives Teamsters Local Union No. 3. Among other benefits, Carpenter Contractors was able to negotiate substantial savings on labor cost under the new collective bargaining agreement. Another significant event is that the Debtors have entered into an Insurance Finance Premium Agreement with Imperial Credit Corporation. [DE #405].

The Debtors have used this chapter 11 to stabilize and keep all three facilities operational without any delay in revenue or new business growth.

### D.    **Projected Recovery of Avoidable Transfers**

The Debtors do not at this time intend to pursue preference, fraudulent conveyance, or other avoidance actions as such actions appear to be of inconsequential value to the estate and a recovery, if any, will outweigh the costs. However, the Debtors have not yet completed their investigation with regard to prepetition transactions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtors may seek to avoid such transfer.

### E.    **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtors reserve the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### F.    **Current and Historical Financial Conditions**

The Debtors' most recent financial statements issued before bankruptcy, each of which was filed with the Court, are set forth in Exhibit B.

The most recent post-petition operating report filed since the commencement of the Debtors' bankruptcy case are set forth in Exhibit C, and all monthly operating reports are available through the Court's PACER system or alternatively will be provided to any party in interest upon written request to counsel for the Debtors.

### G.    **Insiders of the Debtor – Carpenter Contractors of America, Inc.**

Donald L. Thiel – Chairman, President, Director. Donald L. Thiel's percentage of ownership is sixty-one percent.

Kenneth B. Thiel – Director. Kenneth B. Thiel's percentage of ownership is 4.8 percent.

Terrance Smith – Secretary, Treasurer, Vice-President, Director.

Judith Thiel – Director.

Maria Cornelius – Vice President.

Bill Fritsch – Vice President, Director.

### Insiders of the Debtor – CCA Midwest, Inc.

Donald L. Thiel – Director.

Kenneth B. Thiel – President, Director

Judith Thiel – Director.

Mike Sobacki – Director.

Nicole Hughes – Secretary.

### Management of the Debtor Before and During the Bankruptcy – Carpenter Contractors of America, Inc.

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of Carpenter Contractors (collectively the "Managers") were:

| Donald L. Thiel | - | Chairman, President, Director |
|---|---|---|
| Kenneth B. Thiel | - | Director |
| Terrance Smith | - | Corporate Secretary, Treasurer, Vice President, Director |
| Judith Thiel | - | Director |
| Maria Cornelius | - | Vice President |
| Bill Fritsch | - | Vice President, Director |

The Managers of Carpenter Contractors during the Debtor's chapter 11 case have been:

| Donald L. Thiel | - | Chairman, President, Director |
|---|---|---|
| Kenneth B. Thiel | - | Director |
| Terrance Smith | - | Corporate Secretary, Treasurer, Vice President, Director |
| Judith Thiel | - | Director |
| Maria Cornelius | - | Vice President |
| Bill Fritsch | - | Vice President, Director |

After the Effective Date of the order confirming the Plan, the directors, officers, and voting trustees of Carpenter Contractors, any affiliate of Carpenter Contractors participating in a joint Plan

with Carpenter Contractors, or successor of Carpenter Contractors under the Plan (collectively the "Post Confirmation Managers"), will be:

| Donald L. Thiel | - | Chairman, President, Director |
| Kenneth B. Thiel | - | Director |
| Terrance Smith | - | Corporate Secretary, Treasurer, Vice President, Director |
| Judith Thiel | - | Director |
| Maria Cornelius | - | Vice President |
| Bill Fritsch | - | Vice President, Director |

### Management of the Debtor Before and During the Bankruptcy – CCA Midwest, Inc.

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of CCA Midwest (collectively the "Managers") were:

| Donald L. Thiel | - | Director |
| Kenneth B. Thiel | - | President, Director |
| Judith Thiel | - | Director |
| Mike Sobacki | - | Director |
| Nicole Hughes | - | Secretary |

The Managers of CCA Midwest during the Debtor's chapter 11 case have been:

| Donald L. Thiel | - | Director |
| Kenneth B. Thiel | - | President, Director |
| Judith Thiel | - | Director |
| Mike Sobacki | - | Director |
| Nicole Hughes | - | Secretary |

After the effective date of the order confirming the Plan, the directors, officers, and voting trustees of CCA Midwest, any affiliate of CCA Midwest participating in a joint Plan with CCA Midwest, or successor of CCA Midwest under the Plan (collectively the "Post Confirmation Managers"), will be:

| Donald L. Thiel | - | Director |
| Kenneth B. Thiel | - | President, Director |
| Judith Thiel | - | Director |
| Mike Sobacki | - | Director |
| Nicole Hughes | - | Secretary |

III.    **SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

A.      **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.      **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1.      *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtors' chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtors in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. Pursuant to § 503(b)(9) and Court order, the Debtors have paid the administrative expense claim of Ryder Truck Rental, Inc. [DE #196] and claim of ITW Building Components Group, Inc. [DE #264]. Further, the Code requires that all administrative expenses be paid on the Effective Date, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtors' administrative expenses and their proposed treatment under the Plan:

| Type | Proposed Treatment |
|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | Paid in full on the Effective Date, according to terms of obligation if later, or according to separate written agreement |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | Paid in full on the Effective Date of the Plan, according to terms of obligation if later, or according to separate written agreement |
| Professional Fees, as approved by the Court. | Paid in full on the Effective Date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | Paid in full on the Effective Date |
| Other administrative expenses | Paid in full on the Effective Date or according to separate written agreement |
| Office of the U.S. Trustee Fees | Paid in full on the Effective Date of the Plan |

| Don L. Thiel and Judith Thiel | Don and Judith Thiel have agreed with the Debtors to separate treatment as more fully described below. |
|---|---|

Administrative Expense Claims.    Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the Effective Date (as defined in Article VII), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtors.

The Debtors have entered into an agreement with Don and Judith Thiel with regard to their administrative claims as follows:

(a)      The post petition loan in the amount of one million dollars ($1,000,000.00) will be converted into a revolving line of credit as of the Effective Date and funds will be repaid and drawn down as per the Debtors' needs. The outstanding balance will bear interest as 5% per annum.

(b)      The three million and fifty thousand dollar ($3,050,000.00) draw down on the letters of credit secured by the real estate owned by Don and Judith Thiel will be repaid as follows:

   a.  To the extent the funds drawn down by the states of Florida and Illinois are reimbursed to the Debtors they will be repaid to Don and Judith Thiel at that time.

   b.  To the extent the funds are not subject to reimbursement the Debtors will enter an agreed schedule of repayment as and when that determination is made.

   2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by §507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The Debtors do not believe it has any prepetition tax liability. The Debtors note two claims that claim tax priority: Internal Revenue Services, Claim No. 24, and Broward County Records, Tax & Treasury Division, Claim No. 65. The Debtors object to such claims as priority because both proof of claims have been paid in full either prepetition or postpetition. To the extent the Debtors have not paid such claims the Debtors reserve the right to treat as follows: the claims shall receive deferred cash payments equivalent to the present value of their claims, as of the Effective Date. The claims will be paid in full in 15 quarterly installments commencing on the Effective Date, together with interest as the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%).

## C.    **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

   1.    *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following lists all classes containing Debtors' secured prepetition claims and their proposed treatment under the Plan:

**Class 2.1** – Secured Claim of First American Bank – impaired –
The secured claim of First American Bank will be treated as set forth in the Order (1) Authorizing Debtors in Possession to Obtain Postpetition Financing; (2) Authorizing use of Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriorty Claims [DE #334] and attached to the Plan as Exhibit D.

First American has agreed to provide the Debtors with exit financing in the form of (a) a one-year $5,120,000 monitored asset based line of credit renewable annually for three years ("Exit Financing Line of Credit"), and (b) a $2,500,000 term note ("Exit Financing Term Note"), repayable in 36 monthly installments. Amounts advanced under the Line of Credit and the Exit Financing Term Note will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%). Advances under the Exit Financing Line of Credit will be limited to the lesser of (i) $5,120,000 or (ii) 80% of all eligible accounts receivables and 35% of all eligible inventory (with a cap on inventory advances of $2,000,000) (the "Exit Facility").

The collateral securing the claims of First American are substantially all of the Debtors' assets, including but not limited to the Debtors' inventory, accounts receivables, equipment and general intangibles. First American also holds a mortgage lien subject to existing Industrial Revenue Bonds on the Debtors' real property commonly described as 2340 Newburg Road, Belvidere, Illinois (the "Belvidere Property"). Further, pursuant to a Future Advance Deed of Trust, Security Agreement and Fixture Filing Collateral, First American is secured by a first mortgage in real property commonly described as 190 Gillis Hill Road, Hoke County, Fayetteville, North Carolina 28306 (the "Fayetteville Property"). First American provided the Debtors with a revolving line of credit. Additionally, First American has issued letters of credit as additional credit support for the Debtors' obligations under Industrial Revenue Bonds.

**Class 2.2** – Secured Claim of Fifth Third Bank. – impaired –
The Allowed Secured Claims in Class 2.2 are paid in full and deemed satisfied by application of the post-petition payments of the Debtors. Any remaining portion shall be will be paid in full in equal quarterly installments commencing on the Effective Date, and fully amortized over a 15 quarter period with interest at the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%).

The collateral securing the claim of Fifth Third Bank consists of equipment, Shop Dust Collection System, valued by this Plan at $0 after deducting the amount of post petition payments.

**Class 2.2a** - Other Loans of Fifth Third Bank – Unimpaired
The Allowed Secured Claim in Class 2.2a shall retain their liens securing their claims in the collateral and continued to be paid in accordance with terms of the agreement.

The collateral securing the claim of Fifth Third Bank consists of equipment both now in existence and hereafter created. The equipment is fully described on Schedule A attached hereto as Exhibit H.

**Class 2.3** – Secured Claim of Imperial Credit Corporation – unimpaired
The Allowed Secured Claims in Class 2.3 shall retain their liens securing their claims in the collateral and will be paid in accordance with the terms of the agreement. Imperial Credit Corporation is secured by insurance premiums.

**Class 2.4** – Secured Claim of Broward County Tax Collector – unimpaired –
The Debtors object to the claim as being paid in full either prepetition or postpetition, and if such claim has not been paid in full the Debtors reserve the right to pay deferred cash payments equivalent to the present value of their collateral, as of the Effective Date and in 15 quarterly installments commencing on the Effective Date, together with interest at the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%).

The collateral securing the claims of Broward County Tax Collector is commercial real property located at 941 SW 12 Ave, Pompano Beach, FL 33069.

**Class 2.5** – Secured Claim of Gelco Corp. d/b/a GE Fleet Services – unimpaired –
The Allowed Secured Claims in Class 2.5 shall retain their liens securing their claims in the collateral and will be paid in accordance with the terms of the agreement.

The collateral securing the claims Gelco Corp. d/b/a GE Fleet Services pertains to forty six motor vehicle leases. Carpenter Contractors leases twenty-eight vehicles and CCA Midwest leases sixteen.

**Class 2.6** – Secured Claim of GE Commercial Finance Business Property Corporation – unimpaired –
The Allowed Secured Claims in Class 2.6 shall retain their liens securing their claims in the collateral and will be paid in accordance with the terms of the agreement.

GE Commercial Finance Business Property Corporation holds a first mortgage on property generally described as 3900 Avenue G., Winter Haven, Florida. The Debtors and creditor value the property at $3,800,000.00 and creditor claims a balance of $1,168,977.80.

**Class 2.7** – Secured Claim of General Electric Capital Corporation – unimpaired –
The Allowed Secured Claims in Class 2.7 shall retain their liens securing their claims in the collateral and will be paid in accordance with the terms of the agreement

The collateral securing the claim of General Electric Capital Corporation pertains to equipment valued by this Plan at $17,994.62.

2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), (7) and (9) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment. There are no priority unsecured claims.

3.    *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Class[es] 3.1 to 3.6, which contain general unsecured claims against the Debtors:

| Class 3.1 - General Unsecured Creditors | Impaired | Allowed Claims of Creditors in Classes 3.1, 3.2 and 3.3 shall participate pro rata by Class in the distribution of quarterly payments in the amount of $50,000 for year 1 of the Plan, $50,000 for year 2 of the Plan, $75,000 for year 3 of the Plan, and $125,000 for years 4, 5 and 6 of the Plan. Such payments shall be distributed pro rata among Classes 3.1, 3.2 and 3.3. Each holder of an Allowed Claim within Class 3.1 shall receive its Pro Rata Share of the Class 3.1 payment. Payment shall start on the Effective Date. |
|---|---|---|
| Class 3.2 – Pension Funds Creditors | Impaired | Allowed Claims of Creditors in Classes 3.1, 3.2 and 3.3 shall participate pro rata by Class in the distribution of quarterly payments in the amount of $50,000 for year 1 of the Plan, $50,000 for year 2 of the Plan, $75,000 for year 3 of the Plan, and $125,000 for years 4, 5 and 6 of the Plan. Such payments shall be distributed pro rata among Classes 3.1, 3.2 and 3.3. Each holder of an Allowed Claim within Class 3.2 shall receive its Pro Rata Share of the Class 3.2 payment. Payment shall start on the Effective Date. |

| Class 3.3 – Wells Fargo Bank, N.A. Aircraft Claim | Impaired | Allowed Claims of Creditors in Classes 3.1, 3.2 and 3.3 shall participate pro rata by Class in the distribution of quarterly payments in the amount of $50,000 for year 1 of the Plan, $50,000 for year 2 of the Plan, $75,000 for year 3 of the Plan, and $125,000 for years 4, 5 and 6 of the Plan. Such payments shall be distributed pro rata among Classes 3.1, 3.2 and 3.3. Each holder of an Allowed Claim within Class 3.3 shall receive its Pro Rata Share of the Class 3.3 payment. Payment shall start on the Effective Date. |
| --- | --- | --- |
| Class 3.4 – Claimants pursuant to an assumed executory contract or unexpired lease. | Unimpaired | Class 3.4 Claimants shall receive payment of any unpaid cure amount pursuant to the terms of the Court's order authorizing assumption of the lease or executor contract, and shall otherwise receive treatment under applicable law and as provided under such lease or contract as modified or amended by Court order, or subsequent agreement of the parties. |
| Class 3.5 Administrative Convenience Class | Impaired | Class 3.5 consisting of the Allowed Claims of General Unsecured Creditors whose claims do not exceed $30,000.00, or who timely elect to have their claims reduced to $30,000.00. Payment shall be made by the Debtors on or before Effective Date. Payments shall be considered as the full and final satisfaction of any obligation owed by the Debtors. |
| Class 3.6 Unsecured Claims of Don L. Thiel | Impaired | Class 3.6 consists of the Allowed Unsecured Claims of Don L. Thiel, which will be voluntarily subordinated to payment of allowed claims in Classes 3.1; 3.2; 3.3; and 3.4. |

4.     *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtors. In a corporation, entities holding preferred or common stock are equity interest holders. Class 4 Equity Interest Holders are unimpaired and will retain their ownership interests in the Debtors.

D.     **Means of Implementing the Plan**

1.    *Source of Payments and Implementation of the Plan*

Payments and distributions under the Plan will be funded by the Debtors' current and ongoing business operations.  A copy of the Debtors' projected revenues and expenses are attached hereto as Exhibit E.

In addition to the revenues generated by the business operations of the Debtors, the Debtors will have the additional financial flexibility to implement the Plan due to the agreed upon deferral of Don L. Thiel's unsecured claims as set forth in Class 3.6 which will result in additional cash availability and permit the Debtors to implement the treatment set forth in the Plan.

First American has agreed to provide the Debtors with exit financing in the form of (a) a one-year $5,120,000 monitored asset based line of credit renewable annually for three years ("Exit Financing Line of Credit"), and (b) a $2,500,000 term note ("Exit Financing Term Note"), repayable in 36 monthly installments. Amounts advanced under the Line of Credit and the Exit Financing Term Note will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%). Advances under the Exit Financing Line of Credit will be limited to the lesser of (i) $5,120,000 or (ii) 80% of all eligible accounts receivables and 35% of all eligible inventory (with a cap on inventory advances of $2,000,000) (the "Exit Facility").

Similarly, Don and Judith Thiel have agreed to provide the Debtors with exit financing in the form of a $1,000,000 revolving line of credit which shall bear the interest rate of 5% percent ("Exit Financing Revolving Line of Credit"), repayable when the Debtors have available cash flow.

2.    *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor – Carpenter Contractors of America, Inc., and their compensation, shall be as follows:

| | | |
|---|---|---|
| Donald L. Thiel | - | Chairman, President |
| Kenneth B. Thiel | - | Director |
| Terrance Smith | - | Corporate Secretary, Treasurer, Vice President, Director, and |
| Judith Thiel | - | Director |
| Maria Cornelius | - | Vice President |
| Bill Fritsch | - | Vice President, Director |

The Post-Confirmation Managers of the Debtor – CCA Midwest, Inc., and their compensation, shall be as follows:

| | | |
|---|---|---|
| Donald L. Thiel | - | Director |
| Kenneth B. Thiel | - | President, Director |
| Judith Thiel | - | Director |
| Mike Sobacki | - | Director |
| Nicole Hughes | - | Secretary |

E.    **Risk Factors**

The proposed Plan has the following risks:

The Distributions under the Plan are directly related to the Debtors' sales revenue and profitability.

F.    **Executory Contracts and Unexpired Leases**

The Plan, in Exhibit G, lists executory contracts and unexpired leases that the Debtors will assume under the Plan. Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Exhibit G will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

*The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract under the Plan is Fourteen (14) Days following confirmation, or such other time set by Court order.* Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

G.    **Tax Consequences of Plan**

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

**THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS AGAINST THE DEBTORS, BUT IS NOT A COMPLETE DISCUSSION OF ALL SUCH CONSEQUENCES. CERTAIN OF THE CONSEQUENCES DESCRIBED BELOW ARE SUBJECT TO SUBSTANTIAL UNCERTAINTY DUE TO THE UNSETTLED STATE OF THE TAX LAW GOVERNING BANKRUPTCY REORGANIZATIONS. NO RULINGS HAVE BEEN OR WILL BE REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. FURTHER, THE TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AGAINST THE DEBTORS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. IN ADDITION, THERE MAY BE STATE, LOCAL, FOREIGN AND OTHER TAX**

CONSEQUENCES OF THE PLAN APPLICABLE TO PARTICULAR HOLDERS OF CLAIMS OR INTERESTS, NONE OF WHICH ARE DISCUSSED BELOW. THEREFORE, THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM, AND YOU ARE URGED TO CONSULT WITH YOUR OWN TAX ADVISORS CONCERNING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

A portion of the consideration received pursuant to the Plan in payment of a Claim may be allocated to unpaid interest, and the remainder of the consideration will be allocated to the principal amount of the Claim. The tax consequences of the consideration allocable to the portion of a Claim related to interest differ from the tax consequences of the consideration allocable to the portion of a Claim related to principal.

Holders of claims will recognize ordinary income to the extent that any consideration received pursuant to the Plan is allocable to interest, and such income has not already been included in such Creditor's taxable income. The determination as to what portion of the consideration received will be allocated to interest is unclear, and may be affected by, among other things, rules in the Internal Revenue Code (the "Tax Code") relating to original issue discount and accrued market discount. Holders of claims should consult their own tax advisors as to the amount of any consideration received under the Plan that will be allocated to interest. If amounts allocable to interest are less than amounts previously included in the Creditor's taxable income, the difference will result in a loss. Any amount not allocable to interest will be allocated to the principal amount of the Claim paid pursuant to the Plan, and will be treated as discussed herein.

Creditors receiving Cash generally will recognize gain or loss on the exchange equal to the difference between its basis in the Claim and the amount of Cash received that is not allocable to interest. The character of any recognized gain or loss will depend upon the status of the Creditor, the nature of the Claim in its hands and the holding period of such Claim. If a Creditor has treated a Claim as wholly or partially worthless and been allowed a bad debt deduction, the Creditor will include the amount of Cash received in income to the extent such Cash exceeds the Creditor's remaining tax basis in the Claim. Creditors may be entitled to installment sales treatment or other deferral with respect to the distribution they receive subsequent to the Effective Date. Creditors may already have claimed partial bad debt deductions with respect to their claims. The IRS may take the position that holders of Allowed claims cannot claim an otherwise allowable further loss in the year in which their Claim is allowed because they could receive further distributions. Thus, a Creditor could be prevented from recognizing a loss until the time when its Claim has been liquidated and distributions have been completed. If a Creditor is permitted to recognize a loss in the year of the Effective Date by treating the transaction as a "closed transaction" at such time, it may recognize income on any subsequent distribution.

In making distributions pursuant to the Plan, Debtors will comply with applicable withholding and reporting requirements imposed by federal, state or local taxing authorities.

IV.    **CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

## A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 2.1, 2.2, 3.1, 3.2, 3.3, 3.5 and 3.6 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1, 2.2a, 2.3, 2.4, 2.5, 2.6, 2.7 and 3.4 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtors have scheduled the claim on the Debtors' schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

### *The deadline for filing a proof of claim in this case was March 17, 2011.*

### 2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:
- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

4.     *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

B.     **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by cram down on non-accepting classes, as discussed later in Section [B.2.].

1.     *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.     *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a cram down plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not

discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C.   Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as Exhibit I.

A liquidation analysis presumes that the case proceeds under Chapter 7 of the Bankruptcy Code in order to liquidate the assets of the Debtors for distribution to Creditors in accordance with the priorities established by 11 U.S.C. §507 of the Bankruptcy Code. Any liquidation by a Chapter 7 Trustee would result in additional Administrative Expense to the estate and delay in the payment of any dividend to Creditors. As demonstrated in the Projected Liquidation Analysis, presuming an orderly liquidation of the Debtor's assets over a shortened period of time by a Chapter 7 Trustee, most Classes of Creditors, and specifically unsecured creditors, would receive substantially less than they would under the Plan upon liquidation due to the priority of liens in the Debtors' property. The value to unsecured creditors under the proposed plan of reorganization is derived from the going concern revenues and operations of the Debtors as well as the restructured treatment of secured, administrative, and insider claims including the subordination of Don L. Thiel's prepetition claim in the amount of $8,565,000, which restructuring and added value would not exist in connection with a chapter 7 liquidation.

### D.   Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.

#### 1.   *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtors will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the effective date of the Plan and the sources of that cash are attached to this disclosure statement as Exhibit F.

In addition to the revenues generated by the business operations of the Debtors, the Debtors will have the additional financial flexibility to implement the Plan due to the agreed upon deferral of Don L. Thiel's unsecured claims as set forth in Class 3.6 which will result in additional cash availability and permit the Debtors to implement the treatment set forth in the Plan.

First American has agreed to provide the Debtors with exit financing in the form of (a) a one-year $5,120,000 monitored asset based line of credit renewable annually for three years ("Exit Financing Line of Credit"), and (b) a $2,500,000 term note ("Exit Financing Term Note"), repayable in

36 monthly installments. Amounts advanced under the Line of Credit and the Exit Financing Term Note will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%). Advances under the Exit Financing Line of Credit will be limited to the lesser of (i) $5,120,000 or (ii) 80% of all eligible accounts receivables and 35% of all eligible inventory (with a cap on inventory advances of $2,000,000) (the "Exit Facility").

Similarly, Don and Judith Thiel have agreed to provide the Debtors with exit financing in the form of a $1,000,000 revolving line of credit which shall bear the interest rate of 5% percent ("Exit Financing Revolving Line of Credit"), repayable when the Debtors have available cash flow.

> 2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit E.

The Plan Proponent's financial projections show that the Debtors will have an adequate annual cash flow to pay operating expenses and post-confirmation taxes. See attached financial projections for detailed analysis. The final Plan payment is expected to be paid on July 1, 2017.

## V.   **EFFECT OF CONFIRMATION OF PLAN**

### A.   **DISCHARGE OF DEBTORS**

Discharge. On the effective date of the Plan, the Debtors shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtors shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtors will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

**Injunctions. As of the Effective Date, all persons who have held, hold or may hold Claims, or who have held, hold, or may hold Interests, shall be enjoined from taking any of the following actions against the Reorganized Debtors, the Debtors' estate, the assets or properties of the Reorganized Debtors (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order) (i) commencing, conducting, continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Reorganized Debtors, the Debtors' estate or the assets or properties of the Reorganized Debtors, including the stock of the Reorganized Debtors, or any direct or indirect successor in interest to the Reorganized Debtors, or any assets or properties of any such transferee or successor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Reorganized Debtors or the Debtors' estate, including the stock of the Reorganized Debtor, or the assets or properties of the Reorganized Debtors or the Debtors' estate or any**

direct or indirect successor in interest to any of the Reorganized Debtors, or any assets or properties of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Reorganized Debtors or the Debtor's estate or the assets or properties of the Reorganized Debtors or the Debtors' estate or any direct or indirect successor in interest to the Reorganized Debtors, or any assets or properties of any such transferee or successor other than as contemplated by the Plan; (iv) asserting any set off, right of subrogation or recoupment of any kind, directly or indirectly against any obligation due the Reorganized Debtors of the Debtors' estate or the assets or property of the Reorganized Debtors, or any direct or indirect transferee of any assets or property of, or successor in interest to, the Reorganized Debtors; and (v) proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan.

**Exculpation.  Except as otherwise provided in this Plan, the Trustee, Debtors in Possession, their officers, directors, employees, representatives, advisors, attorneys, financial advisors, or agents, or any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, members, employees, representatives, advisors, attorneys, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this plan.**

B.    **Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

C.    **Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

VII.    **GENERAL PROVISIONS**

A. **Notices.** Whenever the Plan requires notice to be given, such notice shall be given to the following parties at their respective addresses unless a prior notice of change of address has been served indicating a new address:

**Debtors**
**Chad P. Pugatch**
**Rice Pugatch Robinson and Schiller, P.A.**
101 NE 3 Ave, Suite 1800
Fort Lauderdale, FL 33301
Facsimile: (954) 462-4300
Email: cpugatch@rprslaw.com

**B. Dates.** The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the Plan.

**C. Further Action.** Nothing contained in the Plan shall prevent Debtors from taking such actions as may be necessary to consummate the Plan, even though such actions may not specifically be provided for within the Plan.

**D. Attachments.** All attachments to the Plan are incorporated herein by reference and are intended to be an integral part of this document as though fully set forth in the Plan. All exhibits to the Plan shall be filed with the Bankruptcy Court no later than five (5) days before the Confirmation Date.

**E. Plan Amendments.** Before the Confirmation Date, the Plan Proponent may modify, amend or withdraw the Plan, without approval of the Bankruptcy Court. After the Confirmation Date, the Proponent or any disbursing agent may, subject to Bankruptcy Court approval and so long as it does not materially or adversely affect the rights set forth in the Plan of creditors and other parties in interest, amend or modify the Plan to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner that may be necessary to carry out the purposes and intent of the Plan.

**F. Binding Effect.** Upon occurrence of the Effective Date, the Plan shall be binding on, and inure to the benefit of the Debtors, the estate, the Claim holders and Interest holders, and their respective successors and assigns, regardless of whether those parties voted to accept the Plan.

**G. Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to any conflicts of law principles.

## VIII.  ALTERNATIVES TO CONFIRMATION

If this Case were converted to Chapter 7 liquidation a bankruptcy trustee would be appointed to take possession and title of Debtors' Property.  While the Chapter 7 trustee can obtain permission to operate a business for a short period of time while the business is being liquidated, continued operation of Debtors' Property during a reasonable marketing period would be unlikely. The appointment of a Chapter 7 trustee would further burden the estate and its creditors with additional administrative expenses above and beyond those administrative claims that have already been incurred.  As stated herein, a sale of the Debtors' property in a Chapter 7 liquidation would bring less than provided for in the Plan if any distribution to creditors beyond Administrative and Secured Claims. See attached Liquidation Analysis.

## IX.    RECOMMENDATION

The Debtors believe that the Plan is in the best interest of all Creditors and provides a recovery, where there otherwise might be greater difficulty and a lower recovery. Therefore, the Debtors recommend Claimants and Interest Holders vote to accept the Plan.

## X.    DISCLAIMERS

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND UNLESS ANOTHER TIME IS SPECIFIED HEREIN, NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR AN EXCHANGE OF RIGHTS MADE IN CONNECTION HEREWITH, SHALL UNDER ANY CIRCUMSTANCE, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. ANY BENEFITS OFFERED TO THE HOLDERS OF CLAIMS OR INTERESTS, IN ACCORDANCE WITH THE PLAN, WHICH MAY CONSTITUTE SECURITIES, HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), OR BY ANY RELEVANT GOVERNMENT AUTHORITY OF ANY STATE OF THE UNITED STATES. NEITHER THE COMMISSION, NOR ANY SUCH STATE AUTHORITY, HAVE PASSED UPON THE ACCURACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. NO REPRESENTATIONS CONCERNING DEBTORS, THE VALUE OF ITS PROPERTY, OR THE VALUE OF ANY BENEFITS OFFERED TO HOLDERS OF CLAIMS OR INTERESTS IN CONNECTION WITH THE PLAN, ARE AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCES WHICH ARE CONTRARY TO THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT ITS DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO UNDERSIGNED COUNSEL. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. WHILE DEBTORS' REAL ESTATE HAS BEEN APPRAISED, OPINIONS OF VALUE MAY DIFFER AND CIRCUMSTANCES MAY CHANGE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE APPROVAL OF THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN, OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

Carpenter Contractors of America, Inc. Debtor in Possession

By: Billy Dale Fritsch, Jr., V.P.

Chad P. Pugatch Attorney for the Plan Proponent for Carpenter Contractors of America, Inc.

CCA Midwest, Inc. Debtor in Possession

By: Billy Dale Fritsch, Jr., V.P.

Chad P. Pugatch Attorney for the Plan Proponent for CCA Midwest, Inc.

**Exhibit A**   Copy of Debtors' Joint Plan of Reorganization

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

IN RE:

CARPENTER CONTRACTORS
OF AMERICA, INC., d/b/a R & D THIEL, and

CCA MIDWEST, INC.,

CASE NO. 10-42604-RBR
CHAPTER 11
(Jointly Administered)

Debtors.
_____/

## DEBTORS IN POSSESSION CARPENTER CONTRACTORS OF AMERICA, INC. AND CCA MIDWEST, INC'S PLAN OF REORGANIZATION

Submitted by:

/s Chad P. Pugatch

_____

CHAD P. PUGATCH, Florida Bar No.: 220582
CHRISTIAN SAVIO, Florida Bar No.: 0084649
Counsel for Debtors in Possession
**RICE PUGATCH ROBINSON & SCHILLER, P.A.**
101 NE 3rd Avenue
Fort Lauderdale, Florida 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300
cpugatch@rprslaw.com



## TABLE OF CONTENTS

**ARTICLE I  INTRODUCTION**................................................................................................... **4**

**ARTICLE II DEFINED TERMS; RULES OF CONSTRUCTION** ........................................ **4**

   2.1    **Defined Terms**.................................................................................................... **4**

   2.1.3  **Rules of Construction.** ....................................................................................... **15**

**ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS** .................................... **15**

**ARTICLE IV TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S.
TRUSTEES FEES, AND PRIORITY TAX CLAIMS** ................................................. **16**

**ARTICLE V TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**.......... **18**

**ARTICLE VI ALLOWANCE AND DISALLOWANCE OF CLAIMS** ................................. **23**

**ARTICLE VII PROVISIONS FOR EXECUTORY CONTRACTS**...................................... **23**

**AND UNEXPIRED LEASES**.................................................................................................... **23**

**ARTICLE VIII** ……………………………………………………………………………...**24**

**MEANS FOR IMPLEMENTATION OF THE PLAN** ........................................................... **24**

**ARTICLE IX** ………………….................................................................................................. **25**

**GENERAL PROVISIONS** ......................................................................................................... **25**

**ARTICLE XI**…………… .......................................................................................................... **28**

**SUBSTANTIAL CONSUMMATION** ...................................................................................... **28**

**ARTICLE XII POST CONFIRMATION JURISDICTION**..................................................... **28**

3

(This page intentionally left blank)

## ARTICLE I
## INTRODUCTION

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of Carpenter Contractors of America, Inc. d/b/a R & D Thiel ("Carpenter Contractors") and CCA Midwest, Inc. ("CCA Midwest") (collectively the "Debtors") from cash flow from operations and future income. This Plan provides for eight classes of secured claims; six classes of unsecured claims; and one class for equity interest holders. Unsecured creditors holding allowed claims will receive distributions from and share in the future profits of the Debtors' operations. This Plan also provides for the payment of administrative and priority claims except as agreed to by such claimant.

All creditors and equity security holders should refer to Articles III through VI of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

## ARTICLE II
## DEFINED TERMS; RULES OF CONSTRUCTION

2.1    **Defined Terms**.

2.1.1.  As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

**"Administrative Claim"** means any Claim for the payment of an Administrative Expense.

**"Administrative Expense"** means (a) any cost or expense of administration of the Reorganization Cases that is allowed under Section 503(b) or 507(a)(1) of the Bankruptcy Code, to the extent the party claiming any such Administrative Expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Reorganization Cases on or before the applicable Administrative Claims Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estates or operating the businesses of the Debtors (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in Possession in the ordinary course of their businesses, (iii) any payment required to be made to cure a default under an assigned contract, including any cure claim, to the extent Allowed by a Final Order of the Bankruptcy Court, (iv) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (v)

5

any Claim by a Governmental Authority for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, to the extent such Claim accrues Postpetition, (vi) compensation (including any bonus) awarded to management of the Debtors by a Final Order of the Bankruptcy Court, and (vii) compensation or reimbursement of expenses of Professionals awarded or Allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code (including any amounts held back during the course of the Reorganization Cases pursuant to an order of the Bankruptcy Court); (b) any superpriority claim; (c) all fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (d) any and all other costs or expenses of administration of the Reorganization Cases that are Allowed by a Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" shall not include any Priority Tax Claim, any Disallowed Claim, any Assumed Obligations, any of the Claims in Classes 1 through 4.

**"Affiliate"** has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

**"Allowed Amount"** means the dollar amount in which a Claim is Allowed.

**"Allowed Claim"** means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date, but which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) or (b) above, as to which either (i) no objection to the allowance thereof has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or the Bankruptcy Court, or (ii) any objection made has been determined and the Claim has been allowed by a Final Order (but only to the extent so allowed). "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court (a) in any contract, instrument or other agreement or document entered into in connection with the Plan; (b) in a Final Order; or (c) pursuant to the terms of the Plan. "Allowed," when used as an adjective herein (such as Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, Allowed Unsecured Claim, and Allowed Deductible Claim), has a corresponding meaning.

**"Allowed Class ... Claim"** means an Allowed Claim in the particular Class described.

**"Assigned Contract"** means any unexpired lease and/or executory contract assumed by any of the Debtors during the Reorganization Cases or under the Plan pursuant to a Final Order of the Bankruptcy Court.

6

"**Assumed Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan.

"**Avoidance Action Recoveries**" means, collectively, Fraudulent Conveyance Action Recoveries and Preference Action Recoveries.

"**Avoidance Actions**" means, collectively, Fraudulent Conveyance Actions and Preference Actions; provided, however, that when used in the Plan, the term "Avoidance Actions" shall not include any causes of action (a) released or waived pursuant to the Plan by order of the Bankruptcy Court or (b) retained by the Reorganized Debtors pursuant to the Plan. An Avoidance Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Avoidance Action with specificity in the Plan or the Disclosure Statement; nor shall the Reorganized Debtors be estopped or precluded under any theory from pursuing the Avoidance Actions. Nothing in the Plan operates as a release of any of the Avoidance Actions.

"**Ballot**" means the ballot accompanying the Disclosure Statement upon which Holders of Claims in each Impaired Class of Claims entitled to vote on the Plan shall indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Reorganization Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bar Date**" means the date(s) established by the Bankruptcy Court from time to time as the last day for filing a Proof of Claim against, or a proof of Equity Interest in, any of the Debtors, including with respect to executory contracts and unexpired leases that are rejected pursuant to the Plan, pursuant to a Final Order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code.

"**Business Day**" means any day other than a Saturday, Sunday or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"**Carpenter Contractors**" means Carpenter Contractors of America, Inc.

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from Carpenter Contractors, as the case may be, drawn on a domestic bank.

"**CCA Midwest**" means CCA Midwest, Inc.

"**Causes of Action**" means any and all of the Debtors' or the Debtors' Estates' actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, against any Creditor or other third party, all of which shall be retained by the Reorganized Debtors on the Effective Date; provided, however, that when used in the Plan, the term "Causes of Action" shall not include (a) any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived under the Plan, by order of the Bankruptcy Court or in writing by the Debtors or the Reorganized Debtors or (b) the Avoidance Actions. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or the Disclosure Statement; nor shall the Reorganized Debtors be estopped or precluded under any theory from pursuing the Causes of Action.

"**Causes of Action Recoveries**" means the proceeds of any Causes of Action.

"**Claim**" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of claim, whenever and wherever such claim may arise.

"**Claimant**" means a person or entity that holds a Claim.

"**Class**" means a category of Claims or Equity Interests classified together as described in Article III of the Plan.

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Clerk's Office**" means the Office of the Clerk of the Bankruptcy Court located at the U.S. Bankruptcy Court, 299 E. Broward Blvd, 1st Floor, Fort Lauderdale, Florida 33301.

"**Collateral**" means Property in which any of the Debtors' Estates has an interest and that secures, in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

**"Confirmation"** or **"Confirmation of the Plan"** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket pursuant to Bankruptcy Rule 5003(a).

**"Confirmation Hearing"** means the hearing(s) which will be held before the Bankruptcy Court pursuant to Section 1128(a) of the Bankruptcy Code in which the Debtors will seek Confirmation of the Plan.

**"Confirmation Order"** means the order of the Bankruptcy Court in the Reorganization Cases confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, which order shall be in form and substance reasonably satisfactory to the Debtors, and shall include any amendments, supplements or modifications thereto made with the consent of the Debtors.

**"Creditor"** means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Creditors with Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims and Unsecured Claims.

**"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Reorganization Cases pursuant to Section 1102 of the Bankruptcy Code, however, to date, no creditors' committee has been appointed.

**"Cure Claim"** means any Claim of any nature whatsoever, including any Claim for any cure payment, cost or other amount, if any, due and owing by the Debtors pursuant to Section 365(b) of the Bankruptcy Code or otherwise and any Claim for a default (monetary or non-monetary), arising from, relating to or in connection with the assumption by any of the Debtors and assignment to any third party of any Assigned Contract, in each case as allowed by a Final Order of the Bankruptcy Court.

**"DIP Lender"** means those entities providing post-petition financing to the Debtors-in-Possession pursuant to order of the Court, including First American, Don L. Thiel, and Judith Thiel.

**"Debt"** has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

**"Debtors"** means, collectively, Carpenter Contractors of America, Inc. d/b/a R & D Thiel and CCA Midwest, Inc.

9

"**Debtors in Possession**" means, collectively, Carpenter Contractors of America, Inc. d/b/a R & D Thiel and CCA Midwest, Inc.

"**Disallowed Claim**" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

"**Disclosure Statement**" means the First Disclosure Statement for Debtors' First Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code dated as of (Court Paper No. _____), including all exhibits, appendices, and schedules attached thereto, as submitted by the Debtors pursuant to Section 1125 of the Bankruptcy Code in respect of the Reorganization Cases and approved by an order of the Bankruptcy Court, and as the same may be amended, supplemented, modified or amended and restated from time to time.

"**Disputed Claim**" means any Claim (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) or (b) above, as to which an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (i) withdrawn, (ii) overruled or denied by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court. In addition to the foregoing, a Disputed Claim shall also mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection. To the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, such Claim shall be a Disputed Claim only to the extent of the amount specified in the Proof of Claim which is in excess of the amount of the Claim as scheduled.

"**Distribution Date**" means, when used with respect to an Allowed Administrative Claim or an Allowed Priority Claim, the date which is as soon as reasonably practicable after the later to occur of (a) the Effective Date and (b) the first Business Day after the date the order of the Bankruptcy Court allowing such Administrative Claim or Priority Claim is entered on the Docket. "Distribution Date," when used with respect to an Allowed Unsecured Claim in Class 3.1, 3.2 and 3.3 means the date selected for any distribution to Holders of Allowed Claims in Class 3.1, 3.2 and 3.3.

10

**"Docket"** means the docket or dockets in the Reorganization Cases maintained by the Clerk.

**"Effective Date"** means, and shall occur on, the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date contained in Article 9.02 of the Plan have been satisfied (as determined by the Debtors) or waived by the Debtors as provided in Article 9.02 of the Plan.

**"Entities Entitled to Notice"** means (a) Reorganized Carpenter Contractors; (b) Reorganized CCA; and (c) the United States Trustee; provided, in each case, that such Person or Entity is in existence.

**"Entity"** has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

**"Estate"** means the estate created for each of the Debtors by Section 541 of the Bankruptcy Code upon the commencement of the Reorganization Case for the Debtors.

**"Estimation Hearing"** means a hearing for the estimation of Claims under Section 502(c) of the Bankruptcy Code.

**"Final Decree Date"** means the date on which a Final Order, obtained after a hearing on notice to all Entities Entitled to Notice and such other parties as the Bankruptcy Court may direct, has been entered determining that the Reorganization Cases should be closed.

**"Final Order"** means (a) an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Reorganization Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling or other decree with like finality.

**"First American"** means First American Bank, Secured Creditor.

**"Fraudulent Conveyance Actions"** means (a) any rights to recover money pursuant to Section 548 of the Bankruptcy Code, and (b) any rights to recover money pursuant to any state fraudulent conveyance laws which the Debtors could have pursued pursuant to Section 544 of the Bankruptcy Code.

11

"**Fraudulent Conveyance Action Recoveries**" means the proceeds of any Fraudulent Conveyance Actions.

"**Governmental Authority**" means any agency, board, bureau, executive, court, commission, department, legislature, tribunal, instrumentality or administration of the United States, a foreign country or any state, or any provincial, territorial, municipal, state, local or other governmental Entity in the United States or a foreign country.

"**Holder**" means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as shown on the Schedules or books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has transferred the Claim to a third party and advised the Debtors, as the case may be, in writing of such transfer and provided sufficient written evidence of such transfer, the transferee.

"**Impaired Class**" means a Class of Claims or Equity Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Interim Compensation Order**" means the Order Granting Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Chapter 11 Professionals [DE 84].

"**Liabilities**" means any and all liabilities, obligations (except for the Assumed Obligations), judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtors or any Affiliate, Subsidiary, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtors or any Affiliate, Subsidiary, predecessor, successor or assign thereof, the Purchased Assets, any other assets of the Debtors, the business or operations of the Debtors, the Reorganization Cases, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligation of the Reorganized Debtors expressly set forth in the Plan.

"**Lien**" means, with respect to any asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other

12

encumbrance or hypothecation or restriction of any nature pertaining to or affecting such asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

**"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**"Permitted Encumbrances"** means any Liens on the Property of the Reorganized Debtors expressly granted pursuant to the Confirmation Order.

**"Person"** means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

**"Petition Date"** means October 25, 2011, the date on which Carpenter Contractors filed their Voluntary Petitions under Chapter 11 of the Bankruptcy Code and October 26, 2011, the date on which CCA Midwest filed their Voluntary Petitions under Chapter 11 of the Bankruptcy Code.

**"Plan"** means the Debtors' First Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code dated as of August 31, 2011, including all Exhibits to the Plan, as the same may be further amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

**"Post-petition"** means arising or accruing on or after the Petition Date and before the Effective Date.

**"Preference Action Recoveries"** means the proceeds of any Preference Actions.

**"Preference Actions"** means any and all of the Debtors' or the Estates' avoidance actions and rights to recover transfers voidable or recoverable under Section 547 of the Bankruptcy Code against any Creditor or other third party.

**"Pre-petition"** means arising or accruing prior to the Petition Date.

**"Priority Claim"** means a Claim that is entitled to a priority in payment pursuant to subparagraphs (3) through (7) of Section 507(a) of the Bankruptcy Code and that is not an Administrative Claim, a Priority Tax Claim, a Secured Claim or an Unsecured Claim.

**"Priority Tax Claim"** means a Claim of a governmental unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Claim, a Secured Claim or an Unsecured Claim.

"**Pro Rata Share**" means, with respect to any distribution under the Plan to the Holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims and all Reserved Claims in such Class and, if applicable, other Classes, all determined as of the applicable Distribution Date.

"**Professional**" means any professional employed in the Reorganization Cases by an order of the Bankruptcy Court pursuant to Section 327 or 1103 of the Bankruptcy Code.

"**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court with respect to the Debtors pursuant to Bankruptcy Rule 3001, 3002 or 3003.

"**Property**" means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"**Record Date**" means the date on which the order approving the Disclosure Statement is entered on the Docket pursuant to Bankruptcy Rule 5003(a), which, pursuant to Bankruptcy Rule 3018(a).

"**Rejected Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan.

"**Reorganized Debtors**" means the Debtors on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

"**Reorganized Carpenter Contractors**" means Carpenter Contractors on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

"**Reorganized CCA Midwest**" means CCA Midwest on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

"**Reserved Claims**" means all Disputed Claims as of the applicable determination date in the full amount listed in the Schedules, unless a Proof of Claim was timely filed with respect to such Claim, in which case in the face amount of such Proof of Claim, or unless such Claim has been estimated by the Bankruptcy Court for the purpose of allowance pursuant to Section 502(c) of the Bankruptcy Code, in which case in such estimated amount. Unless any order of the Bankruptcy Court estimating a Claim provides otherwise, the amount so

14

estimated shall apply both for voting purposes and for purposes of computing Reserved Claims. As used in the Plan, the term "Reserved Claims" shall not include any Disallowed Claims.

"**Schedules**" means, collectively, the Schedules and Statements of Financial Affairs filed by the Debtors in the Reorganization Cases pursuant to Bankruptcy Rule 1007, as such may heretofore or hereafter be amended or supplemented from time to time.

"**Secured Claim**" means any Claim that is (a) secured in whole or in part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the Estate's interest in the value of the Collateral securing any such Claim or the amount subject to setoff, as the case may be. If the value of a Creditor's interest in the Estate's interest in the Collateral securing such Claim or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim; provided, however, that any deficiency owing to the Prepetition Lenders with respect to the Class 2.1 Claims shall not constitute an Unsecured Claim.

"**Secured Creditor**" means any Creditor holding a Secured Claim.

"**Superpriority Claim**" means any Claim created by a Final Order of the Bankruptcy Court providing for a priority senior to that provided in Section 507(a)(1) of the Bankruptcy Code, including any such Claims granted under Sections 364(c)(1) and 365 of the Bankruptcy Code.

"**Unimpaired Claim**" means a Claim that is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**United States**" means the United States of America.

"**United States Trustee**" means the Office of the United States Trustee for the Southern District of Florida.

"**Unsecured Claim**" means any Claim which is not an Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) any portion of a Claim to the extent the value of the Creditor's interest in the Estate's interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, but excluding the deficiency claim of the Prepetition Lenders in respect of the Class 2.1 Claims, (c) any Claim

15

arising from the provision of goods or services to the Debtors prior to the Petition Date, and (d) any Claim designated as an Unsecured Claim elsewhere in the Plan.

**"Unsecured Creditor"** means any Creditor holding an Unsecured Claim.

**"Voting Instructions"** means the instructions for voting on the Plan contained in the Ballot and in the section of the Disclosure Statement entitled "Voting Instructions."

2.1.2    Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

2.1.3    **Rules of Construction**.

For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by such reference and made a part hereof for all purposes; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

3.01    Class 1.        All allowed claims entitled to priority under § 507 of the Code.

3.02    Class 2.1.      The allowed secured claim of First American.

16

Class 2.2.        The claim of Fifth Third Bank to the extent allowed as a secured claim under § 506 of the Code.

Class 2.2a       Other claims of Fifth Third Bank to the extent allowed as secured claims under § 506 of the Code.

Class 2.3.        The claim of Imperial Credit Corporation to the extent allowed as a secured claim under § 506 of the Code.

Class 2.4.        The claim of Broward County Tax Collector to the extent allowed as a secured claim under § 506 of the Code.

Class 2.5.        The claim of Gelco Corp. d/b/a GE Fleet Services to the extent allowed as a secured claim under § 506 of the Code.

Class 2.6.        The claim of GE Commercial Finance Business Property Corporation to the extent allowed as a secured claim under § 506 of the Code.

Class 2.7.        The claim of General Electric Capital Corporation to the extent allowed as a secured claim under § 506 of the Code.

3.03    Class 3.1      General Unsecured Claims allowed under § 502 of the Code, and not designated in any other class under the Plan.

Class 3.2      Pension Fund Creditors

Class 3.3      Wells Fargo Bank, N.A. Aircraft Claim

Class 3.4      Claimants pursuant to an assumed executory contract or unexpired lease

Class 3.5      Administrative Convenience Class

Class 3.6      Unsecured Claims of Don L. Thiel.

3.04    Class 4.0      Equity interests of the Debtors.

**ARTICLE IV**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S. TRUSTEES FEES,**
**AND PRIORITY TAX CLAIMS**

17

4.01   Unclassified Claims.   Under section §1123(a)(1), administrative expense claims, and priority tax claims are not in classes.

4.02   Administrative Expense Claims.   Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the effective date of this Plan (as defined in Article VII), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtors.

The Debtors have entered into an agreement with Don and Judith Thiel with regard to their administrative claims as follows:

(a)   The post petition loan in the amount of one million dollars ($1,000,000.00) will be converted into a revolving line of credit as of the Effective Date and funds will be repaid and drawn down as per the Debtors' needs. The outstanding balance will bear interest as 5% per annum.

(b)   The three million and fifty thousand dollar ($3,050,000.00) draw down on the letters of credit secured by the real estate owned by Don and Judith Thiel will be repaid as follows:

a.   To the extent the funds drawn down by the states of Florida and Illinois are reimbursed to the Debtors they will be repaid to Don and Judith Thiel at that time.

b.   To the extent the funds are not subject to reimbursement the Debtors will enter an agreed schedule of repayment as and when that determination is made.

4.03   Priority Tax Claims.   The Debtors do not believe it has any prepetition tax liability. The Debtors note two claims that claim tax priority: Internal Revenue Services, Claim No. 24 and Broward County Records, Tax & Treasury Division, Claim No. 65. The Debtors object to such claims as priority because both proof of claims have been paid in full either prepetition or post petition. To the extent the Debtors have not paid such claims the Debtors reserve the right to treat as follows: the claims shall receive deferred cash payments equivalent to the present value of their claims, as of the effective date of the plan. The claims will be paid in full in 15 quarterly installments commencing on the Effective Date, together with interest as the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%).

4.04   United States Trustee Fees.   All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the effective date of this Plan will be paid on the effective date.

18

## ARTICLE V
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

5.01    Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|-------|-----------|-----------|
| Class 1 - Priority Claims | Unimpaired | The Debtors do not believe they have any prepetition tax liability. The Debtors note two claims that claim tax priority: Internal Revenue Services, Claim No. 24 and Broward County Records, Tax & Treasury Division, Claim No. 65. The Debtors object to such claims as priority because both proof of claims have been paid in full either prepetition or post petition. To the extent the Debtors have not paid such claims the Debtors reserve the right to treat as follows: the claims shall receive deferred cash payments equivalent to the present value of their claims, as of the effective date of the plan. The claims will be paid in full in 15 quarterly installments commencing on the Effective Date, together with interest as the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%). |

| Class 2.1 – Secured Claim of First American Bank | Impaired | The secured claim of First American Bank will be treated as set forth in the Order (1) Authorizing Debtors in Possession to Obtain Postpetition Financing; (2) Authorizing use of Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims [DE #334] and attached to the Disclosure Statement as Exhibit D.

First American has agreed to provide the Debtors with exit financing in the form of (a) a one-year $5,120,000 monitored asset based line of credit renewable annually for three years ("Exit Financing Line of Credit"), and (b) a $2,500,000 term note ("Exit Financing Term Note"), repayable in 36 monthly installments. Amounts advanced under the Line of Credit and the Exit Financing Term Note will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%). Advances under the Exit Financing Line of Credit will be limited to the lesser of (i) $5,120,000 or (ii) 80% of all eligible accounts receivables and 35% of all eligible inventory (with a cap on inventory advances of $2,000,000) (the "Exit Facility"). |

| Class 2.2 – Secured Claim of Fifth Third Bank | Impaired | The Allowed Secured Claim of Fifth Third Bank, after deducting the amount of post petition payments, if any, shall retain its liens securing its claims in the collateral and receive deferred cash payments equivalent to the present value of its secured claim, as of the Effective Date.  The Allowed Secured Claims in Class 2.2 will be paid in full in equal quarterly installments commencing on the Effective Date, and fully amortized over a 15 quarter period with interest at the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%).

The Debtors believe that there is no remaining secured claim of Fifth Third Bank after application of post petition payments, and class 2.2 is set forth herein only to the extent that the Court determines that there is an unpaid remaining allowed secured claim. |
| Class 2.2a – Other Secured Claim of Fifth Third Bank | Unimpaired | The Allowed Secured Claim in Class 2.2a shall retain its liens securing its claims in the collateral and continued to be paid in accordance with terms of the agreement. |
| Class 2.3 – Secured Imperial Credit Corporation | Unimpaired | The Allowed Secured Claims in Class 2.3 shall retain its liens securing its claims in the collateral and will be paid in accordance with the terms of the agreement.  Imperial Credit Corporation is secured by insurance premiums. |

21

| Class 2.4 – Secured Broward County Tax Collector | Unimpaired | The Debtors object to the claim as being paid in full either prepetition or post petition, and if such claim has not been paid in full the Debtors reserve the right to pay deferred cash payments equivalent to the present value of its collateral, as of the Effective Date and in 15 quarterly installments commencing on the Effective Date, together with interest at the United States Prime Rate as listed in the Eastern print edition of the Wall Street Journal on the Effective Date plus one percent (1%). |
|---|---|---|
| Class 2.5 – Secured Gelco Corp. d/b/a GE Fleet Services | Unimpaired | The Allowed Secured Claims in Class 2.5 shall retain its liens securing its claims in the collateral and will be paid in accordance with the terms of the agreement. |
| Class 2.6 – Secured GE Commercial Finance Business Property Corporation | Unimpaired | The Allowed Secured Claims in Class 2.6 shall retain its liens securing its claims in the collateral and will be paid in accordance with the terms of the agreement. |
| Class 2.7 – Secured General Electric Capital Corporation | Unimpaired | The Allowed Secured Claims in Class 2.7 shall retain its liens securing its claims in the collateral and will be paid in accordance with the terms of the agreement |
| Class 3.1 - General Unsecured Creditors | Impaired | Allowed Claims of Creditors in Classes 3.1, 3.2 and 3.3 shall participate pro rata by Class in the distribution of quarterly payments in the amount of $50,000 for year 1 of the Plan, $50,000 for year 2 of the Plan, $75,000 for year 3 of the Plan, and $125,000 for years 4, 5 and 6 of the Plan. Such payments shall be distributed pro rata among Classes 3.1, 3.2 and 3.3. Each holder of an Allowed Claim within Class 3.1 shall receive its Pro Rata Share of the Class 3.1 payment. Payment shall start on the Effective Date. |

| | | |
|---|---|---|
| Class 3.2 – Pension Funds Creditors | Impaired | Allowed Claims of Creditors in Classes 3.1, 3.2 and 3.3 shall participate pro rata by Class in the distribution of quarterly payments in the amount of $50,000 for year 1 of the Plan, $50,000 for year 2 of the Plan, $75,000 for year 3 of the Plan, and $125,000 for years 4, 5 and 6 of the Plan. Such payments shall be distributed pro rata among Classes 3.1, 3.2 and 3.3. Each holder of an Allowed Claim within Class 3.2 shall receive its Pro Rata Share of the Class 3.2 payment. Payment shall start on the Effective Date. |
| Class 3.3 – Wells Fargo Bank, N.A. Aircraft Claim | Impaired | Allowed Claims of Creditors in Classes 3.1, 3.2 and 3.3 shall participate pro rata by Class in the distribution of quarterly payments in the amount of $50,000 for year 1 of the Plan, $50,000 for year 2 of the Plan, $75,000 for year 3 of the Plan, and $125,000 for years 4, 5 and 6 of the Plan. Such payments shall be distributed pro rata among Classes 3.1, 3.2 and 3.3. Each holder of an Allowed Claim within Class 3.3 shall receive its Pro Rata Share of the Class 3.3 payment. Payment shall start on the Effective Date. |
| Class 3.4 – Claimants pursuant to an assumed executory contract or unexpired lease. | Unimpaired | Class 3.4 Claimants shall receive payment of any unpaid cure amount pursuant to the terms of the Court's order authorizing assumption of the lease or executor contract, and shall otherwise receive treatment under applicable law and as provided under such lease or contract as modified or amended by Court order, or subsequent agreement of the parties. |
| Class 3.5 Administrative Convenience Class | Impaired | Class 3.5 consisting of the Allowed Claims of General Unsecured Creditors whose claims do not exceed $30,000.00, or who timely elect to have their claims reduced to $30,000.00. Payment shall be made by the Debtors on or before Effective Date.    Payments shall be considered as the full and final satisfaction of any obligation owed by the Debtors. |

| Class 3.6 Unsecured Claims of Don L. Thiel | Impaired | Class 3.6 consists of the Allowed Unsecured Claims of Don L. Thiel, which will be voluntarily subordinated to payment of allowed claims in Classes 3.1; 3.2; 3.3; and 3.4. |
| Class 4 - Equity Security Holders of the Debtors | Unimpaired | Class 4 Equity Interest Holders are unimpaired and will retain their ownership interests in the Debtors. |

## ARTICLE VI
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

6.01    Disputed Claim. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtors or another party in interest has filed an objection; (ii) no proof of claim has been filed, and the Debtors has scheduled such claim as disputed, contingent, or unliquidated.

6.02    Delay of Distribution on a Disputed Claim. No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. The Debtors will reserve the full amount of the distribution on account of any Disputed Claim or such amount allowed by the Court pursuant to 11 U.S.C. § 502(c), and will distribute any such reserved amounts along with the next quarterly plan payment after the claim becomes an Allowed Claim in an amount equal to the pro rata distribution of on account of the Allowed Claim pursuant to the Plan and with any remaining reserved funds distributed pro rata to other creditors of equal class and priority.

6.03    Settlement of Disputed Claims. Following confirmation, the Debtors will have the sole power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

6.04    Deadline to Object to Claims. The Deadline to object to claims shall be on or before the final confirmation hearing or some other date as established by order of the Bankruptcy Court.

## ARTICLE VII
## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.01    Assumed Executory Contracts and Unexpired Leases.

24

(a)     In addition to those leases or contracts previously assumed by the Debtors, upon the Effective Date as provided in Article VIII, the Debtors hereby assume the following executory contracts and/or unexpired leases with: (1) Donald L. Thiel for the use of non-residential real properties located at 941 SW 12th Ave., Pompano Beach, FL 33069; 3900 Ave. G., NW, New Haven, FL 33880; 190 Gills Hill Road, Fayetteville, NC 28306; and 2340 Newburg Road, Belvidere, IL 61008 ("Thiel Leases"); (2) FLA Owner, LLC for the use of non-residential real property located at 9950 Princess Palm Ave., Tampa, FL 33619 ("FLA Lease"); and (3) WL Properties for the use of non-residential real property located at 2160 and 2162 Andrea Lane, Ft. Myers, FL 33912 ("WL Leases").

(b)     The Debtors will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed, or before the date of the order confirming this Plan, upon the Effective Date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than fourteen (14) days after the date of the order confirming this Plan.

## ARTICLE VIII
## MEANS FOR IMPLEMENTATION OF THE PLAN

8.1     Funding from Debtors' Business Operations. Payments and distributions under the Plan will be funded by the Debtors' current and ongoing business operations which are sufficient to meet the obligations under this Plan. Financial projections and analysis are described in further detail in the Disclosure Statement filed with the Court and circulated in connection with this Plan as well as the exhibits affixed thereto.

Subordination of Insider Claims, Treatment of Post-Petition Financing. In addition to the revenues generated by the business operations of the Debtors, the Debtors will have the additional financial flexibility to implement the Plan due to the agreed upon deferral of Don L. Thiel's unsecured claims as set forth in Class 3.6 which will result in additional cash availability and permit the Debtors to implement the treatment set forth in the Plan.

First American has agreed to provide the Debtors with exit financing in the form of (a) a one-year $5,120,000 monitored asset based line of credit renewable annually for three years ("Exit Financing Line of Credit"), and (b) a $2,500,000 term note ("Exit Financing Term Note"), repayable in 36 monthly installments. Amounts advanced under the Line of Credit and the Exit Financing Term Note will be subject to a floating interest rate of 30-day LIBOR plus 4.0% (with an interest rate floor of 6.0%). Advances under the Exit Financing Line of Credit will be limited to the lesser of (i) $5,120,000 or (ii) 80% of all eligible accounts receivables and 35% of all eligible inventory (with a cap on inventory advances of $2,000,000) (the "Exit Facility").

25

Similarly, Don and Judith Thiel have agreed to provide the Debtors with exit financing in the form of a $1,000,000 revolving line of credit which shall bear the interest rate of 5% percent ("Exit Financing Revolving Line of Credit"), repayable when the Debtors have available cash flow.

8.2     Place and Manner of Payments or Distributions.  Distributions shall be delivered by either (i) mail to the address as listed in the Schedules of Assets and Liabilities, or listed on any proof of claim filed by a claimant, or (ii) to such other address that such claimant shall have specified for payment purposes in a written notice to Debtors.

8.3     Undeliverable Distributions.  If a distribution to any claimant is returned as undeliverable, the Debtors shall use reasonable efforts to determine such claimant's current address, and no further distributions shall be made to such Claimant unless and until the Debtors are notified of such Claimant's current address.

8.4     Treatment of Unclaimed or Undeliverable Distributions.  If any claimant entitled to distributions from the Plan cannot be located prior to the Effective Date, then, such distribution shall be held by the Debtors for a period of thirty days while the provisions of paragraph 8.4 are implemented, after which time any such distribution shall be paid pro-rata to other members of equal class and priority.

## ARTICLE IX
## GENERAL PROVISIONS

9.01     Definitions and Rules of Construction.  The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the definitions set forth above in paragraph 2.1.

9.02     Effective Date. The effective date of this Plan is the 30th day following the deadline for a party in interest to file an appeal of the confirmation order. Unless expressly ordered by a court of competent jurisdiction an appeal shall not act as a stay of the confirmation order, the effective date, or consummation of the plan. If a stay of the confirmation order is in effect on the effective date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

9.03     Severability.     If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

9.04    Binding Effect.    The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

9.05    Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

9.06    Controlling Effect.    Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

9.07    Notices. Whenever the Plan requires notice to be given, such notice shall be given to the following parties at their respective addresses unless a prior notice of change of address has been served indicating a new address:

**Debtors**
**Chad P. Pugatch**
**Rice Pugatch Robinson and Schiller, P.A.**
101 NE 3 Ave, Suite 1800
Fort Lauderdale, FL 33301
Facsimile: (954) 462-4300
Email: cpugatch@rprslaw.com

9.08    Dates. The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the Plan.

9.09    Further Action. Nothing contained in the Plan shall prevent Debtors from taking such actions as may be necessary to consummate the Plan, even though such actions may not specifically be provided for within the Plan.

9.10    Attachments. All attachments to the Plan are incorporated herein by reference and are intended to be an integral part of this document as though fully set forth in the Plan. All exhibits to the Plan shall be filed with the Bankruptcy Court no later than five (5) days before the Confirmation Date.

9.11    Plan Amendments. Before the Confirmation Date, the Plan Proponent may modify, amend or withdraw the Plan, without approval of the Bankruptcy Court. After the Confirmation Date, the Proponent or any disbursing agent may, subject to Bankruptcy Court approval and so long as it does not materially or adversely affect the rights set forth in the Plan of creditors and other parties in interest, amend or modify the Plan to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner that may be necessary to carry out the purposes and intent of the Plan.

9.12    Binding Effect. Upon occurrence of the Effective Date, the Plan shall be binding on, and inure to the benefit of the Debtors, the estates, the Claim holders and Interest holders, and their respective successors and assigns, regardless of whether those parties voted to accept the Plan.

9.13    Governing Law. Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and

enforced in accordance with, the laws of the State of Florida, without giving effect to any conflicts of law principles.

## ARTICLE X
## DISCHARGE

10.1    Discharge.    Except as otherwise provided in this Plan, on the Effective Date the Reorganized Debtors shall be discharged, pursuant to Section 1141(d)(1) of the Bankruptcy Code, from all Claims and Debtors that arose before the Effective Date of this Plan from any liability of any kind whether or not: (a) a Proof of the Claim is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of such Claim has accepted the Plan. On the Effective Date as to every discharged debt and Claim, the Creditor that held such debt or Claim shall be permanently barred from asserting against the Reorganized Debtors, or against the Reorganized Debtors' assets or properties, any further or other Claim based upon any document, instrument or act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. Except as otherwise specifically provided herein, nothing in this Plan shall be deemed to waive, limit or restrict in any way the discharge granted upon Confirmation of the Plan pursuant to § 1141 of the Code and effective as of the Effective Date.

10.01    Injunctions. As of the Effective Date, all persons who have held, hold or may hold Claims, or who have held, hold, or may hold Interests, shall be enjoined from taking any of the following actions against the Reorganized Debtors, the Debtors' estate, the assets or properties of the Reorganized Debtors (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order) (i) commencing, conducting, continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Reorganized Debtors, the Debtors' estate or the assets or properties of the Reorganized Debtors, including the stock of the Reorganized Debtors, or any direct or indirect successor in interest to the Reorganized Debtors, or any assets or properties of any such transferee or successor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Reorganized Debtors or the Debtors' estate, including the stock of the Reorganized Debtors, or the assets or properties of the Reorganized Debtors or the Debtors' estate or any direct or indirect successor in interest to any of the Reorganized Debtors, or any assets or properties of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Reorganized Debtors or the Debtors' estate or the assets or properties of the Reorganized Debtors or the Debtors' estate or any direct or indirect successor in interest to the Reorganized Debtors, or any assets or properties of any such transferee or successor other than as contemplated by the Plan; (iv) asserting any set off, right of subrogation or recoupment of any kind, directly or indirectly against any obligation due the Reorganized Debtors of the Debtors' estate or the assets or property of the Reorganized Debtors, or any direct or indirect transferee of any assets or property of, or successor in interest to, the Reorganized Debtors; and (v) proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan.

10.02  **Exculpation.  Except as otherwise provided in this Plan, the Trustee, Debtors in Possession, their officers, directors, employees, representatives, advisors, attorneys, financial advisors, or agents, or any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, members, employees, representatives, advisors, attorneys, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this plan.**

## ARTICLE XI
## SUBSTANTIAL CONSUMMATION

11.1  **Substantial Consummation.**  The Plan shall be deemed substantially consummated immediately on the completion of all material actions required to be undertaken at the Effective Date.

11.2  **Notice of Effective Date.** Promptly after occurrence of the Effective Date, Debtors shall file with the clerk of the Bankruptcy Court a notice that the Plan has become effective; *provided, however,* that the failure to file such notice shall not affect the effectiveness of the Plan or the rights or substances obligations of any entity hereunder.

11.3  **Final Decree.** After the Effective Date, the Debtors may move for a final decree closing the case and requesting such other orders as may be necessary and appropriate.

## ARTICLE XII
## POST CONFIRMATION JURISDICTION

12.1  The Bankruptcy Court, even after the case has been closed, shall have jurisdiction to the fullest extent of the law over all matters arising under, arising in, or relating to Debtors' chapter 11 cases, including proceedings to:

a.  Ensure the consummation and implementation of the Plan;

b.  Enter such orders as may be necessary or appropriate to implement, consummate, or enforce the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement;

c.  Consider any modification of the Plan under Section 1127 of the Bankruptcy Code;

d.     Hear and determine all Claims, controversies, suits and disputes against estate to the extent permitted under 28 U.S.C. § 1334;

e.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any and all objections to the allowance or priority of Claims;

f.     Hear, determine, and adjudicate any litigation involving the Litigation Claims or other claims or causes of action constituting Property;

g.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the estate that may be pending on or commenced after the Effective Date;

h.     Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any entity's obligations incurred in connection with the Plan, or any other agreements governing, instruments evidencing, or documents relating to any of the foregoing, including the interpretation or enforcement of any rights, remedies, or obligations under any of the foregoing;

i.     Hear and determine all controversies, suits, and disputes that may arise out of or in connection with the enforcement of any and all subordination and similar agreements among various creditors pursuant to Section 510 of the Bankruptcy Code;

j.     Hear and determine all requests for compensation and/or reimbursement of expenses that may be made for fees and expenses incurred before the Effective Date;

k.     Enforce any Final Order, the Confirmation Order, the final decree, and all injunctions contained in those orders;

l.     Enter an order concluding and terminating this case;

m.     Correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order;

n.     Determine all questions and disputes regarding title to the Property;

o.     Classify the Claims of any Claim holders and the treatment of these Claims under the Plan, to re-examine Claims that may have been allowed for purposes of voting, and to determine objections that may be filed to any Claims;

p.     Take any action described in the Plan involving the post-confirmation Debtors, sale of Property, or the Disbursing Agent;

q.     Enter a final decree in Debtors' case as contemplated by Bankruptcy Rule 3022;

r.      Enforce, by injunction or otherwise, the provisions set forth in the Plan, the Confirmation Order, any final decree, and any Final Order that provides for the adjudication of any issue by the Bankruptcy Court; and

s.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

12.2    If the Bankruptcy Court abstains, exercises discretion, or is otherwise precluded from hearing any matter within the scope of its jurisdiction, nothing in the Plan shall prohibit or limit the exercise of jurisdiction by any other tribunal of competent jurisdiction.

31

Carpenter Contractors of America, Inc. Debtor in Possession

By: Billy Dale Fritsch, Jr., V.P.

Chad P. Pugatch Attorney for the Plan Proponent for Carpenter Contractors of America, Inc.

CCA Midwest, Inc. Debtor in Possession

By: Billy Dale Fritsch, Jr., V.P.

Chad P. Pugatch Attorney for the Plan Proponent for CCA Midwest, Inc.